**UNITED STATES of America, Plaintiff,**

**v.**

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**No. 69 Civ. 200 (DNE).**

United States District Court,
S. D. New York,
Civil Division.

June 27, 1974.

Raymond M. Carlson, James I. Serota and Steven M. Woghin, Dept. of Justice, Antitrust Div., Washington, D. C., for plaintiff.

Cravath, Swaine & Moore, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City (Charles M. Waygood and Job Taylor, III, New York City, of counsel), for defendant.

## OPINION

EDELSTEIN, Chief Judge.

### I.  INTRODUCTION

On April 16, 1973, this court entered an order, designated Special Master Order No. 1, appointing special masters pursuant to Fed.R.Civ.P. 53 for the purpose of making recommendations to the court regarding the validity of claims of privilege asserted by the parties. Defendant International Business Machines Corporation (IBM) withheld from production to plaintiff certain documents generated by the so-called Cravath, Swaine & Moore Task Forces and the so-called Office of Business Practices. IBM asserts that certain documents generated by these groups are either privileged under the attorney-client privilege or are entitled to the special immunity accorded to attorney work-product by Fed.R.Civ.P. 26(b)(3). It contends that the task forces and Office of Business Practices were created at the request of counsel for the purpose of educating counsel regarding the electronic data processing industry (EDP) and to assist counsel in the investigation and defense of any litigation which might emanate from the Department of Justice's investigation in the late nineteen-sixties of the EDP industry in general, and of IBM specifically. IBM alleges that the activities of the various task forces and Office of Business Practices were in anticipation or defense of litigation. The Government, on the other hand, contends that although lawyers may have been involved in the studies and activities of these task forces, the documents generated by these groups were created to assist IBM executives in making business decisions.

In order to make recommendations to the court with respect to these claims of privilege, the masters held evidentiary hearings.

Special Master McLaughlin submitted a memorandum to the court raising the question of the applicability of the Publicity in Taking Evidence Act, 15 U.S.C. § 30 (1970), to evidentiary hearings before the special masters. By order entered on October 20, 1973, which was designated Special Master Order No. 7, the court expressly ruled that the Publicity in Taking Evidence Act was applicable to all evidentiary hearings before the special masters for determining asserted claims of privilege. This order recognized, however, that certain allegedly privileged information may be introduced into evidence at these hearings. Accordingly, Special Master Order No. 7 authorized the special masters to issue protective relief to preserve the confidentiality of allegedly privileged documents and testimony offered into evidence at the hearings pending culmination of the proceedings and rulings on the claims of privilege.

By letter dated September 11, 1973, addressed to the court, Special Masters Meyer and McLaughlin set forth the procedures established for conducting the hearings with respect to the Cravath, Swaine & Moore Task Forces and the Office of Business Practices. These procedures were derived at a meeting attended by the masters and counsel for both parties. In relevant part these procedures provided as follows:

1. Joint hearings by both Special Masters will be held for the purpose of receiving evidence with respect to various task forces constituted by IBM . . . .

2. The testimony of IBM's witnesses will be presented in the form of affidavits which are to be prepared and submitted to the Government, to the Court and to the Masters not later than October 1, 1973.

3. The Government will then have until October 15th to review the affidavits and advise IBM and the Masters which of the IBM witnesses the Government desires to have produced for cross-examination and what additional witnesses will be produced by the Government. . . .

On October 1, 1973, in conformance with the procedures outlined above, defendant submitted the affidavits of five attorneys [1] to establish its claims with respect to the Cravath, Swaine & Moore Task Forces and the Office of Business Practices. The evidentiary hearings were conducted on October 24 and 26, 1973. At the outset of hearing Master Meyer stated:

I suppose the logical way to begin this, since we adopted the procedure of having affidavits submitted by IBM, is to have those affidavits formally offered and marked, and then let the Government proceed with its rebuttal.[2]

After much debate over (1) the authenticity of certain documents that the Government intended to introduce into evidence and (2) the admissibility of portions of the IBM affidavits, the hearing proceeded. Although plaintiff did not call any of the IBM affiants for cross-examination, it did call to testify four former employees and one current employee of IBM having various connections with the projects that were the subject of the hearings.[3] Additionally, the Government entered into evidence portions of the depositions of five other

1. The affiants were: George B. Turner, then a partner in the firm of Cravath, Swaine & Moore; Nicholas deB. Katzenbach, currently the Vice President and General Counsel of IBM; Burke Marshall, formerly the Vice President and General Counsel of IBM and currently Deputy Dean and Professor of Law at the Yale Law School; Harold F. McGuire, Jr., formerly an associate with the firm of Cravath, Swaine & Moore and then an Assistant United States Attorney for the Southern District of New York; G. Oliver Koppell, formerly an associate of the firm of Cravath, Swaine & Moore and currently associated with the firm of Krause, Hirsch & Gross.

2. Transcript of the hearing before Special Masters on October 24 and 26, 1973 at 2 [hereinafter referred to as Tr. ——].

3. Plaintiff called to testify under subpoena at the hearings four former employees of IBM, including Otis S. Page, Jr., a former employee of IBM who worked for a time in the Office of Business Practices, was then employed by Memorex Corporation and is presently employed by the firm of Shugart Associates; Carl Gamrath, a retired former employee of IBM who also worked for a time in the Office of Business Practices; Richard H. Bullen, a former senior Vice President of IBM whose employment with IBM terminated on May 6, 1972; and Stewart H. Greenfield, a former employee of IBM, presently a partner in the Sprout Capital Group and associated with Donaldson, Lufkin & Jenrette, Inc., who also worked for a time in the Office of Business Practices. Plaintiff also called Hilary A. Faw, Jr., the Assistant Treasurer of IBM since 1965 and the Director of the Office of Business Practices commencing in July, 1968.

IBM employees.[4] Moreover, numerous documents offered by plaintiff were received in evidence both in connection with the testimony of the various witnesses and independently of any testimony. These documents had been produced to plaintiff from IBM.

In addition to the previously mentioned affidavits of present and former IBM attorneys, defendant introduced excerpts from three of the five depositions of IBM employees that the Government, in part, entered into evidence.[5] IBM also submitted ninety-five (95) documents from the files of Hilary A. Faw, Jr., the Assistant Treasurer of IBM and one time Director of the Office of Business Practices, which were withheld from production to plaintiff as privileged. Mr. Faw was one of the witnesses called by the Government. Pursuant to Special Master Order No. 7 these documents were submitted to the masters for their consideration *in camera*. By procedure adopted at the close of the hearings the Special Masters permitted defendant to submit these documents with the proviso that if any of these documents were utilized in reaching their findings of fact and conclusions of law, they would specifically state which document or documents, if any, were used and would attempt to provide redacted copies to the Government. Tr. 317–25. By letter dated December 12, 1973 to James I. Serota, an attorney with the Antitrust Division of the Department of Justice, Special Master Meyer unequivocally stated that the Faw documents were not considered by the special masters in reaching their findings of fact and conclusions of law.

On December 12, 1973 the Special Masters' Preliminary Report was filed; it contained a brief introduction, findings of fact and conclusions of law.

Pursuant to Fed.R.Civ.P. 53(e)(5) the masters invited the parties to make written comments addressed to the preliminary report.

Both parties responded to the preliminary report. After considering the suggestions tendered, the masters made some slight modifications of the preliminary report and on January 14, 1974 rendered their final report.

Thereafter, pursuant to Fed.R.Civ.P. 53(e)(2), both parties served and filed written objections to certain of the findings of fact and conclusions of law and moved before this court for orders setting aside, modifying and amending the Final Report of the Special Masters. The specific objections will be discussed in parts III (Government) and IV (IBM) of this opinion.

## II. STANDARDS OF REVIEW

The power of a special master is completely dependent upon the order of reference. Fed.R.Civ.P. 53(c) in relevant part provides that "[t]he order of reference to the master . . . may direct him to report only upon particular issues or to do or perform particular acts . . . ." Special Master Order No. 1 states that the special masters were appointed in this case "for the purpose of conducting hearings and *making recommendations to the court regarding the validity of claims of privilege* asserted by the parties with respect to documents . . . ." (emphasis added) Accordingly, the court views the final report of the masters including their findings of fact and conclusions of law as recommendations regarding the validity of claims of privilege asserted by the parties. Although these recommendations may be accepted or rejected by the court as appropriate or inappropriate, the court will deal with the suggested

---

4. In addition to the testimony of the witnesses, mentioned in note 3, *supra*, plaintiff entered into evidence selected excerpts from the deposition testimony of five additional employees including H. G. Figueroa, J. J.

Forese, D. Sturges, J. P. McDermott and D. A. Finley.

5. These excerpts were from the depositions of Messrs. Figueroa, Sturges and McDermott.

findings as though they had been specifically required by Special Master Order No. 1 and subject to the standard of review contained in Fed.R.Civ.P. 53(e)(2), which, in pertinent part, provides: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." The Supreme Court has defined "clearly erroneous" as follows: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." [6]

It is firmly established that a "Master's conclusions of law have no effect except to the extent that they are correct propositions of law." 5A J. Moore, Federal Practice ¶ 53.12 [5] (2d. ed 1974) [hereinafter cited as 5A. J. Moore]. For the most part the conclusions of law attacked by the parties in the pending motions are not statements of law *per se,* but rather are mixed questions of fact and law. In regard to such a finding Professor Moore states that "an ultimate finding by a master that involves a mixed question of law and fact is subject to a scrutinizing and careful review." 5A Moore ¶ 53.12 [5] & n. 3.

■ Neither the Government nor IBM would dispute that the utilization of the "clearly erroneous" standard of Rule 53(e)(2) is desirable in this court's review of the special masters' findings of fact. What they do disagree about is the applicability of the *Gypsum* rule under these circumstances. This rule takes its name from the case in which it was articulated, United States v. United States Gypsum Co., 333 U.S. 364, 68 S. Ct. 525, 92 L.Ed. 746 (1947). Simply stated, the rule instructs that when oral testimony is contradicted by contemporaneous documents the trier of fact should give little weight to the oral testimony. 333 U.S.at 395–396, 68 S.Ct. 525.[7]

Plaintiff contends that under the circumstances in which the hearings before the special masters were conducted, the masters "were required to resolve evidentiary conflicts between IBM contemporaneous documents on the one hand and the assertions of IBM lawyers and businessmen on the other in favor of the conclusion dictated by the contemporaneous documents." Not to do so is asserted to be clear error under *Gypsum.*

Defendant, on the other hand, points to United States v. Yellow Cab Co., 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949), "as stating a companion rule to the so-called 'Gypsum rule.'" It contends that the *Yellow Cab* case would permit the masters to review all the evidence and come to their conclusions based on any permissible view of the weight of the evidence.

A reading of the two cases clearly reveals that the decisions of the Supreme Court on the issue of whether the courts below had committed clear error was resolved on the basis of altogether different fact patterns. In *Gypsum* contemporaneous documents were contradicted by subsequent oral testimony. In this situation the Court mandated that the trier

---

6. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L. Ed. 746 (1947).

7. The Government in the zeal of advocacy implied that the *Gypsum* case commanded the trier of fact to reach the conclusion dictated by the contemporaneous documents:
It is plaintiff's position that, in these circumstances the Special Masters were *required to resolve evidentiary conflicts* between IBM contemporaneous documents

on the one hand and the assertions of IBM lawyers and businessmen on the other *in favor of the conclusion dictated by the contemporaneous documents.*
Memorandum in Support of Motion to Set Aside and Amend the Final Report of Special Masters After Evidentiary Hearings of October 24 and 26, 1973 at 2 (emphasis added). The rule only states that little weight is to be accorded to oral testimony which is contradicted by contemporaneous documents.

of fact should give little weight to the oral testimony.

*Yellow Cab* presented an entirely different situation. It is true, as defendant suggests, that the Supreme Court stated that the Government in *Yellow Cab* "relied in large part on *inferences from its 485 exhibits*" and that *"defendants relied heavily on oral testimony to contradict those inferences"*. 338 U.S. at 340, 70 S.Ct. at 178. (emphasis added). But this brief statement is a slim reed on which to predicate a companion rule to the pronouncement in *Gypsum*. If the Court was articulating a companion rule to *Gypsum*, it seems curious indeed that *Gypsum* was not even cited in *Yellow Cab* let alone discussed or analyzed.

The significant factual findings in *Yellow Cab* concerned matters that the Court described as

imponderables, such as the intent of parties to certain 1929 business transactions, whether corporate officers were then acting in personal or official capacities, what was the design and purpose and intent of those who carried out twenty-year-old transactions, and whether they had legitimate business motives or were intending to restrain trade of their competitors in car manufacture, such as General Motors, Ford, Chrysler and Packard.

338 U.S. at 340, 70 S.Ct. at 178. In such circumstances the ability of the trial court to observe the demeanor of witnesses was deemed highly significant. The Court articulated this position as follows:

Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them. If defendants' witnesses spoke the truth, the findings are admittedly justified. The trial court listened to and observed the officers who had

made the records from which the Government would draw an inference of guilt and concluded that they bear a different meaning from that for which the Government contends.

338 U.S. at 341, 70 S.Ct. at 179.

Accordingly, it is the court's view that *Gypsum* and *Yellow Cab* stand for different propositions and do not state companion rules.

## III. GOVERNMENT OBJECTIONS

█ The Government objected to finding 9, which states:

9. CS & M [Cravath, Swaine & Moore] III, also known as the Bullen Task Force, and occasionally known as the Business Practices Task Force, the Unbundling Task Force and the Von Kohorn Task Force, was established at the request of IBM's counsel in December 1968 and concluded its work by approximately June, 1969. The work of CS & M III was guided by counsel from Cravath, Swaine & Moore, principally Mr. G. Oliver Koppell who was then associated with the Cravath firm.

Plaintiff contends that documents admitted into evidence contradict finding 9 in at least three respects. First, CS & M III was not the same group as the Bullen Task Force. Secondly, CS & M III was not established at the request of counsel and, lastly, CS&M III was not directed by Cravath, Swaine & Moore, IBM's outside counsel.

The Government asserts that the group known as the Bullen Task Force was organized by Richard H. Bullen, then a senior IBM officer, at the direction of Thomas J. Watson, Jr., then the chief executive officer of IBM. Additionally, plaintiff contends that the activities of this group were directed by Bullen rather than counsel. In support of this contention plaintiff points to its exhibits numbered 8–14.[8] PX–8 is a

---

8. The exhibits referred to are those admitted into evidence at the hearings before the special masters. Hereinafter these exhibits will be referenced as follows: PX– ——.

memorandum from T. J. Watson, Jr. to Bullen; it indicates that carbon copies were sent to T. V. Learson, A. K. Watson and A. L. Williams, then all senior IBM officers. The document, which is dated November 7, 1968, is reproduced in the margin.[9] In pertinent part, it provides that "effective immediately" Bullen was to become Special Assistant reporting to Watson "on the matter of business practices." Additionally, the memo indicates that Bullen is to keep management informed and that the time for the assignment of this project was estimated to be 120 days.

PX–9 is a portion of a memorandum from D. P. Phypers, an IBM official, to T. J. Watson, Jr., T. V. Learson, A. K. Watson and A. L. Williams.[10] This document, dated December 18, 1968, states that "Bullen will review with you the present status of the work he has underway" in connection with "Business Practices." In another memorandum (PX–10), dated January 13, 1969, from Phypers to the four senior IBM officials who were the addressees of PX–9, it is stated that A. K. Watson will chair the January 14 MRC [11] meeting. One of the topics for discussion was listed as follows:

> (1) Business Practices—This will be the first in the series of discussions with the *Bullen Task Force aimed at reaching conceptual agreement on our course of action in the unbundling* [12] *area.* (footnote and emphasis added)

The next document relied on by plaintiff is PX–11, which is a memo from Bullen to F. T. Cary, another senior IBM official and currently IBM's chief executive officer. This document sets forth a number of planned meetings between Bullen's task force and various IBM management committees. In it Bullen concludes that it will be necessary to abandon some of these planned

9. PX–8 reads as follows:

COPY

MEMORANDUM

CONFIDENTIAL

To: Mr. R. H. Bullen

November 7, 1968

Confirming our discussion with you today on the matter of business practices, you will become, effective immediately, Special Assistant reporting to me. In this assignment you will be expected to:

1. Organize and coordinate all facets of our current business practices work. Your plan to do so should address the various pieces of work currently under way as well as that additional work which you feel is necessary. You have the authority to get assistance from the Management Committee, Corporate Staff, and line organization.
This plan should be completed and reviewed with the MRC as soon as possible.

2. Keep the Corporate Office continuously informed as to the status of ongoing work and any new developments.

3. Arrange to involve the Corporate Office appropriately in discussions leading to strategic, policy, and negotiating decisions.

It is our intent that this assignment is a temporary one to last approximately 120 days. The end date will be determined by the time required to complete the necessary work to reach conclusions on the action and policy items included in your work plan. The overall objective of this phase should be to provide us with a firm strategic base from which we can soundly deal with specific incidents in the months ahead.

At the completion of this phase of the work we will make a judgment as to the requirements for future management of this area.

TJW,Jr/gp        T. J. Watson, Jr.
cc: Mr. T. V. Learson
    Mr. A. K. Watson
    Mr. A. L. Williams
          COPY

10. The addressees of this memorandum were all senior IBM officers: T. J. Watson, Jr. was Chairman of the Board, T. V. Learson was President (and more recently Chairman of the Board), A. K. Watson was Vice Chairman of the Board, A. L. Williams was Chairman of the Executive Committee.

11. MRC stands for Management Review Committee, which was one of the highest management groups within IBM.

12. Unbundling is the practice of charging computer customers separately for the furnishing of various services (such as maintenance) and software.

meetings in order to complete the task force's scheduled work.

PX–12, 13 and 14 are communications from Bullen to various members of his task force and to other IBM officials not directly connected with the task force in which he informed them that some of these. planned meetings with management were being cancelled.

Collectively PX–8 through 14 establish that Bullen headed a task force organized in November, 1968,[13] which was formally known as the "Business Practices Strategic Task Force," and informally as the Bullen Task Force. None of these documents indicate that this task force was also called CS & M III. It is also clear that unbundling was the subject matter with which this group was concerned. Furthermore, it should be noted that none of these documents mention counsel or suggest any legal involvement of the Bullen task force.

The Government offered another group of documents, marked as exhibits and entered into evidence before the masters, in support of the following contentions: (a) the Bullen Task Force and CS & M III were distinct entities; (b) that a large task force was established by IBM in February, 1969 (about two or three months after the original Bullen group began its work); (c) it was this larger group that became known within

IBM as CS & M III; (d) this larger group did the detail work for the smaller Bullen group; (e) the larger group (CS & M III) was linked to the Bullen task force by three IBM businessmen (Beitzel, Forese, and Figueroa); (f) these three men were known as the Troika and (g) they guided the daily activity of CS & M III.

PX–48 is an excerpt from the deposition of Howard G. Figueroa, an IBM official who was a member of the Bullen Task Force. It indicates that the group known as the Bullen Task Force was started in November or December 1968, that it was a successor to the Kearns Task Force (CS & M II), and that originally it had approximately a dozen members.[14] Additionally, Figueroa's deposition reveals that another task force was created in February, 1969 "[t]o do the detail work that had been generally outlined by the smaller Bullen group." Furthermore, it states that this additional task force initially had about fifteen members but toward the end of its work it had approximately 100 members.[15]

In other excerpts from Figueroa's deposition it is stated that the larger additional task force was referred to as CS & M III (PX–53B), that the linkage between the smaller Bullen group and the larger CS & M III group was pro-

13. Other testimony suggested that the task force which Bullen headed was established in December, 1968. See, e. g., Turner Affidavit, ¶ 13. Bullen's task force was probably organized during November and December 1968.

14. Figueroa identified the original members as follows:

Mr. Bullen, who was a Corporate Vice President; Mr. Faw, who was an Assistant Treasurer; Mr. Opel, Corporate Vice-President; Mr. Rizzo, who I think at that time was Corporate Controller; Mr. McLaughlin, counsel; Mr. Katzenbach, Corporate Vice-President and counsel; Mr. Turner from Cravath, Swaine and Moore; Mr. Beitzel, Assistant General Manager at the Data Processing Group and Vice-President; Mr. Forese, DP

Group Director of Finance; Mr. Figueroa, DP Group Director of Management Systems, and although I don't think he was there, when we first got started, Mr. Armstrong, and I don't recall his position. PX–48.

15. PX–51, which is an excerpt from the deposition of Forese, indicates that there were approximately 250 people on the *Bullen Task Force* during the early stages and approximately 500 people during the implementation phase. The implementation phase refers to the period after June 23, 1969, when IBM announced that it would unbundle. During the time period the larger number of people on the task force effectuated the changes in business procedure required by the unbundling decision.

vided by three IBM businessmen—*i. e.*, Beitzel, Forese and Figueroa (PX–49) —and that these three men "had the responsibility to direct on a day-to-day basis the work of the larger group." (PX–49). It was also established that Beitzel, Forese and Figueroa were collectively known as the "Troika" (PX–54A). Thus, the excerpts from Figueroa's deposition support most of the Government contentions stated above.

In further support of its contention that CS & M III and the Bullen Task Force were separate entities, the Government offered PX–54. This document is a memorandum from Forese to nine other IBM employees [16] with an indication that carbon copies were sent to Beitzel and Figueroa. Stamped in the upper-left-hand corner of this document is the legend "CS & M STUDY III." Immediately below this the words "Not to be reproduced" are printed in smaller type. In the upper-right-hand corner is the date, February 18, 1969, and above that the following is typed: "DPG HQ Harrison." [17] Attached to this memorandum is a list of dates when reports on various subjects would be available from two work groups. One group is labelled Bullen, and the other is designated "Troika." From Figueroa's testimony it was established that "Troika" referred to Beitzel, Forese and Figueroa in their capacity as directors of CS & M III. Accordingly, it is apparent that the label "Bullen" in the attachment to PX–54 refers to the dozen or so members of the smaller original group and the term "Troika" refers to the larger task force which Figueroa stated was called CS & M III.

Plaintiff concludes that the documents discussed above "establish the existence of two *distinct* groups," (emphasis add-

ed). The Government is correct in this assertion. Nevertheless, the exhibits also suggest that the two groups worked on substantially the same subject matters. It should also be observed that none of these documents reveal any direction by IBM's outside counsel, Cravath, Swaine & Moore. Additionally, none of the documents support the masters finding that CS & M III was created at the request of counsel.

The major evidence offered in support of finding 9 is contained in the affidavits of IBM counsel.[18]

Before exploring this evidence it will be useful to set forth defendant's view as to why the task forces were established and how they operated. This background information is found in ¶ 7 of the Turner affidavit. In relevant part it states:

[F]rom time to time I advised IBM to establish small groups of knowledgeable businessmen who would have as their exclusive function, for a temporary period of time, the provision of assistance to counsel. My requests led to the formation of several task forces whose work varied over time and consisted, among other things, of making a great number of analyses specifically outlined by me responsive to various issues and questions involved in the investigation by the Department of Justice and threatened and, subsequently, actual litigation in order to assist other counsel and me in advising the corporation. Those groups in general were responsible to counsel for developing and analyzing facts and issues within guidelines established by counsel, in testing the validity of various contentions and legal theories, and in proposing and evaluating various courses of action relevant to the De-

---

16. These employees were: W. E. Burdick, D. A. Finley, D. T. Kearns, J. T. Lawson, J. P. McDermott, C. B. McLaughlin, H. W. Stigler, D. M. Sturges, C. P. Webb.

17. "DPG HQ Harrison" apparently stands for Data Processing Group Headquarters.

Harrison is a town in Westchester County, New York.

18. *See* note 1 *supra* and accompanying text.

partment and third parties. They worked continuously with lawyers from my firm and from IBM, as set forth in greater detail below, and during their active. periods I personally spent the majority of my time directing their efforts.

With respect to finding 9, three of the affidavits state that CS & M III was established by counsel in December, 1968:

(1) *Turner affidavit ¶ 13* in relevant part states:

[O]n December 6, 1968, IBM announced publicly for the first time that it was studying the traditional industry practice of furnishing services and software without charge. That announcement was made at the commencement of work by a third task force, established in December, 1968, known as CS & M III. It was headed by a senior IBM Vice President, R. H. Bullen, and was sometimes referred to as the Bullen task force, the Business Practices task force or the Von Kohorn task force, the latter because it worked and met in the Von Kohorn building in Harrison, New York. I had an office in that building where I spent the majority of my time during the active phase of the task force and attended most of the meetings of the task force. I also assigned an associate of my firm, G. Oliver Koppell, to work with and direct the task force efforts on a day-to-day basis. IBM's Assistant General Counsel, C. B. (Chet) McLaughlin, assisted by a staff attorney, Robert Townsend, and other counsel also attended most of the meetings of the group. The progress and work of the group was continuously reviewed and directed by Burke Marshall, Nicholas deB. Katzenbach, the then new General Counsel of IBM, and me.

(2) *Marshall affidavit ¶ 9:*

Again as set forth in the affidavit of George B. Turner, it became necessary to establish a third task force, known as CS & M III, in December, 1968. As was the case with its predecessors, it was formed at my specific instance and for the sole purpose of assisting counsel.

(3) *Koppell affidavit ¶ 4:*

In late 1968, at the request of Mr. Turner, a task force was established to assist counsel in a review of IBM's business and pricing practices and to provide the basis for legal advice to the client. The task force was headed by IBM Senior Vice President, R. H. Bullen and was referred to as CS & M III, as well as the Bullen task force or the Business Practices task force. I was assigned by Mr. Turner to work with the task force and to direct its efforts on a day-to-day basis in order to guide the group in our analyses and evaluations of past and proposed practices in light of the requirements of law.

A fourth affidavit states that CS & M III was created at the request of counsel but does not fix a date for its creation.

(4) *Katzenbach affidavit ¶ 6:*

One of the ongoing problems concerned the traditional industry practice of furnishing services and software without separate charge, commonly called bundling. At that time there was a substantial effort under way by counsel to complete a thorough review and analysis of that practice and whether and how it might be changed. Counsel was assisted by a select group of IBM employees headed by a senior Vice President, Richard H. Bullen. The effort, initiated by George Turner of Cravath, Swaine & Moore, and my predecessor, was known as CS & M III, the unbundling task force and various other names; it was under the direct supervision of Mr. Turner, his associate, Mr. Koppell, IBM's Assistant General Coun-

sel, C. B. McLaughlin, and several staff attorneys. The work of the group was reviewed frequently by Mr. Marshall (who had retained some legal responsibilities) and me and performed well its function of providing the necessary foundation upon which we and Cravath, Swaine & Moore could advise the Corporation on this important matter.

At first blush the excerpted portions of these affidavits seem to be consistent. Under scrutiny, however, certain ambiguities and inconsistencies become evident. First, with respect to CS & M I & II, Turner clearly stated that he specifically requested that these task forces be established.[19] It seems odd indeed that Mr. Turner did not use the same or similar language with respect to CS & M III. Moreover, this failure to state that he specifically requested the creation of CS & M III is inconsistent with statements contained in the affidavits of Messrs. Koppell and Katzenbach. Koppell stated that the task force referred to as CS & M III was established "[i]n late 1968, at the request of Mr. Turner." The Katzenbach affidavit states that CS & M III was "initiated by George Turner of Cravath, Swaine & Moore, and my predecessor."[20] Additionally, the Marshall affidavit asserts that CS & M III, "[a]s was the case with its predecessors [CS & M I and II], . . . was formed at my specific in-

stance." Although it might be suggested that these inconsistencies are trivial, they are nevertheless important in the context of the instant controversy. Defendant was permitted to establish a prima facie case with these affidavits regarding the status to be accorded to the CS & M task forces and the Office of Business Practices (OBP).[21] Consequently, it must be concluded that the affidavits, which were prepared in contemplation of the hearing, were prepared diligently and with great care.

In general, however, the affidavits are the predicate for finding 9. Indeed, it seems fair to state that finding 9 was gleaned from paragraph 13 of the Turner affidavit.

Additional support for finding 9 was offered by the testimony given at the hearings before the masters. Richard H. Bullen testified that his task force was organized at the request of counsel (Tr. 164 L. 9–24; Tr. 177 L. 8–9), that it was referred to as CS & M III (Tr. 157 L. 22–24; Tr. 163 L. 17–22), that it was also referred to as the Von Kohorn Task Force (Tr. 163 L. 23 to Tr. 164 L. 2), that it performed work requested by counsel (Tr. 153 L. 6–10), and that "for the most part" the members of CS & M III "were . . . not involved in the daily work of running the IBM company." (Tr. 169 L. 6–15).

---

19. Turner affidavit ¶ 9 and ¶ 12, which provide, in pertinent part as follows:

¶ 9. *At my specific request*, in November and early December, 1967 *a small task force of IBM businessmen was established* to review and analyze various facts and issues relating to the industry practice and IBM's methods of doing business and to furnish such information to me and other outside counsel for the purpose of enabling us to properly advise the corporation under the circumstances. The task force was headed by Howard G. Figueroa and came to be known as *CS&M I* or the Figueroa task force. . . . (emphasis added)

¶ 12. As a result of the conferences with the Department and the receipt of

the draft complaint, *and again at my specific suggestion, a task force was formed* in September, 1968 to conduct further studies and analyses to enable my firm and inside counsel more fully to understand the current business practices and to prepare for what appeared to be inevitable litigation.

The second task force was headed by David T. Kearns and became known as CS&M II or the Kearns task force.

20. Katzenbach's predecessor was Burke Marshall, whom Katzenbach succeeded as Vice President and General Counsel of IBM.

21. *See* pp. 156–158 *supra*.

Hilary A. Faw, Jr. testified that CS & M III began in December 1968, that it was headed by Bullen and that it was sometimes called the Bullen Task Force (Tr. 270 L. 9–21). He also identified various inside and outside IBM counsel as members of the CS & M III Task Force (Tr. 271 L. 6–14).

In general, the testimony given by Bullen and Faw offer support to finding 9. It cannot be overlooked, however, that both of these witnesses were closely connected with IBM. Additionally, after carefully studying all of Bullen's testimony, it became quite evident that he was extremely vague at times and often could not recall specific information. For example, he could not recall the term "Business Practices Strategic Task Force." (Tr. 166 L. 2–9). This was the formal name of the Bullen Task Force when it was first created. It appeared on PX–11, –12, –13 and –14, all of which are memos dated December 20, 1968 and written by Bullen.

Having set forth the evidence from the record supporting and contradicting finding 9, the court can now evaluate finding 9. As stated earlier, the Supreme Court has defined "clearly erroneous" as follows: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." [22] Applying this test to the matter under review, the court concludes that finding 9 is clearly erroneous and must be rejected.

First, finding 9 fails to reflect the evolution of the Bullen Task Force into the Bullen-CS & M III effort. There is testimony that loosely lumps, as does finding 9, the Bullen and CS & M III Task Forces together. The court, however, is convinced that the Bullen Task Force was established shortly after November 7, 1968, which is the date of the

memorandum from T. J. Watson, Jr. to Bullen (PX–8). Thereafter, some two or three months later a larger group was formed to do the work outlined by the original Bullen group. It was this larger group that became known as CS & M III within IBM. This sequence of events is presented in the Figueroa deposition (PX–48, –49, –53B, and –54A) but is not reflected in finding 9.

In reaching this conclusion the court has accorded greater weight to the documents and deposition excerpts submitted by plaintiff than to the testimony and affidavits tendered by defendant. The affidavits, unlike the documents, were prepared in contemplation of the special masters' proceeding and must be weighed accordingly. With respect to the testimony of Bullen and Faw, it should be observed that both of these witnesses were closely connected with IBM. Bullen is a shareholder and a former Senior Vice President of IBM; Faw is currently the Assistant Treasurer of defendant. In any event, Bullen's testimony was often so vague and indefinite that it cannot be accorded much weight.

Additionally, PX–8 (the Watson-Bullen memo) was a clear command to Bullen from the chief executive officer of IBM to take charge of "business practices." Although Bullen testified that the term "business practices" meant "[t]he work required and requested of outside and inside counsel" (Tr. 153), this is not reflected in PX–8. To the contrary, PX–8 strongly suggests that Bullen's work was business related. *See* note 9 *supra.*

Lastly, there is a clear and unequivocal admission by Thomas D. Barr, Esquire (the partner in the Cravath firm who is in charge of this litigation) which stated that CS & M III and IV "were studies undertaken by the IBM Corporation to consider and to make cer-

---

22. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1947).

tain changes in the way in which it conducted business." Furthermore, Barr asserted "that CS & M III and CS & M IV are not covered by the attorney-client privilege to any greater or different extent than the ordinary run-of-the mill documents might be." This admission, which the court regards as having great significance, will be discussed in detail in connection with plaintiff's objection to finding 13.

■ The next finding to which the Government objected is finding 13, which states:

> The work of CS & M IV was directed by Messrs. Evangelista and McKinney, inside counsel to IBM.

Plaintiff put forth three exhibits in support of its objection to finding 13. The first two (PX–68 and PX–73) pertain directly to finding 13. The third (PX–47) is a deposition excerpt in which Mr. Barr stated that CS & M III and IV were business studies entitled to no special application of the attorney-client privilege. Although this exhibit does not directly bear on finding 13, it tends to undermine all of the masters' findings and conclusions with regard to CS & M III and IV.

PX–68 is part of a memorandum to R. A. Pfeiffer, Jr. from D. W. Sweeney dated August 7, 1969. The memo contains a list of items to be discussed with Mr. O. M. Scott. The first item is listed under the heading "Service Practices Task Force." It states:

> This is headed by Mr. D. W. Brunner. Attached is subject list and members. Members of the group meet weekly with Messrs. Bullen, Cary, Beitzel, Opel, Scott, Figueroa and Forese. This group may be as important as the Bullen Task Force.

Attached to this memo are two lists. One is styled "Maintenance Task Force Review Committee"; the other is headed "Financial Projects."

PX–73 is a short excerpt from the deposition of Sturges, an IBM employee

involved in CS & M IV, which indicates that CS & M IV was headed by Dale Brunner, an IBM businessman.

The Government points out that PX–68 does not list Mr. Evangelista as part of the Service Practices or Maintenance Task Force, which were some of the other names by which CS & M IV was known. Plaintiff also asserts that the only attorney listed among twenty-five named individuals is Lew McKinney. More significantly, PX–68 indicates that this task force met weekly with a group consisting solely of IBM businessmen. Additionally, PX–68 does not indicate or even suggest that the work of CS & M IV was on behalf of counsel. In fact, the list of financial projects strongly indicates that CS & M IV was concerned with business problems.

The last document offered by plaintiff in support of its objection to finding 13 is the previously mentioned admission of Mr. Barr. This document (PX–47) is a two-page excerpt from the deposition of Papes, an IBM employee, in which Mr. Barr made a statement regarding the status of CS & M III and IV. In relevant part, Mr. Barr stated:

> CS & M III and IV were studies undertaken by the IBM Corporation to consider and to make certain changes in the way in which it conducted business.
>
> At the time we produced documents to CDC about the end of 1969 and the beginning of 1970 I was aware of the existence of these studies but had not had any opportunity to determine the nature of them, and because it was not clear to me the extent to which those studies were covered by the attorney-client privilege, I instructed the document reviewers of whom there were very many to withhold from production all documents which bore the stamp CS & M III or CS & M IV. Plainly they were not successful in all cases in withholding those documents.

Since that production and indeed very recently I have had an opportunity to determine that CS & M III and CS & M IV are not covered by the attorney-client privilege to any greater or different extent than the ordinary run-of-the mill documents might be.

To make that clear, there are or may be within all of the documents stamped CS & M III and CS & M IV some documents which reflect advice sought or advice given by attorneys, but in the main the documents stamped CS & M III and CS & M IV are not privileged.

I therefore intended to produce all of the documents which have been withheld which bear that stamp, except those which, upon a review, are determined to be in and of themselves privileged.

This statement is clear and unequivocal. First, it states that the CS & M III and IV studies were undertaken "to consider and to make certain changes in the way in which [IBM] conducted its business." Secondly, the statement concedes that although certain documents stamped CS & M III and CS & M IV may be privileged, "in the main the documents stamped CS & M III and CS & M IV are not privileged."

PX–47 is the most significant document submitted in support of the Government objections to the report of the special masters. It pertains not only to finding 13, under which the Government chose to discuss it, but rather to all the masters' findings and conclusions concerning CS & M III and IV.

IBM presented a three-pronged argument in support of finding 13. First, defendant pointed to relevant excerpts from the affidavits. Secondly, it argued that the conclusions drawn by the Government from PX–68 and PX–73 are incorrect. Thirdly, as to the Barr statement (PX–47), IBM relied on a statement made by Charles M. Waygood, Esquire (IBM lead counsel for proceedings before the special masters) which attempted to explain Barr's admission. At the urging of Master Meyer, counsel for plaintiff avoided the necessity of having Mr. Barr testify at the hearing by stipulating that if Barr were called to testify he would give the same explanation made by Mr. Waygood.

Support for finding 13 can be found in the affidavits of IBM counsel. After explaining why it was necessary to establish CS & M IV,[23] Mr. Turner outlined how CS & M IV operated. This outline is contained in paragraph 18 of his affidavit, which provides as follows:

The senior personnel assigned to CS & M Study IV acted essentially as a Steering Committee and additional personnel were employed to perform much of the detail work and fact analysis. The day-to-day direction of the task force was performed by a senior IBM attorney, D. A. (Dan) Evangelista, and an attorney from the field engineering division, L. S. McKinney,

---

23. In paragraph 17 of his affidavit, Turner explained why CS&M IV was established. He averred:

By the Spring of 1969, as a result of the pending litigation and the substantial amount of work done up to that time, I identified a number of additional questions requiring further analysis and consideration by counsel. I discussed those with Mr. Marshall and Mr. Katzenbach and we agreed that certain senior members of the prior task force, under the direction of Mr. Katzenbach and Mr. McLaughlin and with the assistance of Mr. Faw, would analyze those and additional questions identified by Messrs. Marshall and Katzenbach for the purpose of preparing reports for use by counsel. At approximately the same time, a number of issues relating to maintenance were identified as requiring separate analysis by a group more qualified in the subject than those working in CS&M III. This combination led to what was termed CS&M Study IV, a fourth task force known variously as the maintenance or FE task force and the Service Practices Group. Questions dealing peculiarly with the pending litigation were assigned elsewhere and the task force dealt primarily with maintenance related issues.

assisted by D. W. Brunner, a businessman. I reviewed and commented upon the work of the group from time to time, but was not as closely associated with it as had been the case on prior occasions. The task force's work commenced in approximately June 1969 and continued into early 1970, with revisions in IBM's maintenance policies and contracts occurring in the period of March–May, 1970. As with CS & M III, files and documents relating simply to changes in policy and implementation of those changes, as distinguished from studies of legal issues and reports prepared for counsel, have been produced and not withheld as privileged or work product.

In paragraph 17 of his affidavit,[24] Turner stated that the need for expert analysis of "maintenance" related issues "led to what was termed CS & M Study IV." As with CS & M III, Turner does not state that this task force was established at his specific request. In paragraph 18 of his affidavit Turner

stated that Evangelista and McKinney (in-house IBM lawyers) assisted by Brunner (an IBM businessman) monitored the day-to-day work of CS & M IV. With the exception of any mention of Brunner's role, this statement is reflected in finding 13.

Additional support for finding 13 is contained in the Katzenbach affidavit.[25] In the main, Mr. Katzenbach's averments parallel those made by Turner. Katzenbach, did, however, state that "[He] generally directed the work of [CS & M IV], with the assistance of Messrs. Bullen and Faw."

In the second part of its argument in support of finding 13, defendant argues that plaintiff's reliance on PX–68 as listing all members of the CS & M IV Task Force is misplaced. The Sturges deposition, part of which is contained in PX–73, indicates that Howard Figueroa was a member of the CS & M IV steering committee.[26] PX–68 does not, however, list Figueroa. Sturgis testified at his deposition that he was a secretary to

---

24. *Id.*

25. Paragraphs 9 and 10 of the Katzenbach affidavit state as follows:

9. As a result of discussions with Mr. Turner, Mr. Marshall and others over a period of time, a number of questions and issues common to the Department's action and the other litigation had been identified as requiring substantial analysis by counsel in preparation for IBM's defense. One such issue involved the general subject of maintenance, a subject not addressed in detail by the CS&M III task force. To assist counsel in dealing with these questions and issues, a fourth task force was formed, subsequently known as CS&M IV. Initially I contemplated that the work of the fourth task force would encompass not only maintenance but the other subjects as well. That soon proved impractical due to the scope of the maintenance questions and the volume of work they required. As a result, the task force focused upon maintenance related issues (becoming known as the maintenance or FE task force) and the other subjects were referred elsewhere for analysis.

10. I assigned a senior IBM attorney, Mr. D. A. Evangelista, to direct the ef-

forts of the fourth task force on a day-to-day basis with the assistance of Mr. McKinney, another senior attorney from IBM's field engineering division. I generally directed the work of the task force, with the assistance of Messrs. Bullen and Faw, through a Steering Committee. Mr. Turner also reviewed its work with me and provided additional guidance. The information developed and furnished to counsel by the task force enabled us to formulate and recommend certain changes in IBM's maintenance policies and ultimately resulted in revisions to IBM's forms of contracts. The work of the group was necessary and was utilized both in connection with the preparation for the defense of the pending litigation and in the revision of IBM's policies and contracts.

26. PX–73, which is an excerpt from the Sturges deposition (p. 276, L. 1 to p. 285, L. 25), is reproduced at Tab 7 of IBM's Appendix to its Memorandum in Response to Plaintiff's Motion to Set Aside and Amend the Final Report of Special Masters After Evidentiary Hearing of October 24 and 26, 1973.

the CS & M IV steering committee and that there were between twenty and fifty people involved in CS & M IV.[27] Neither Sturges' own participation nor the involvement of the number of people that Sturges said were involved is reflected in PX–68. In fact, PX–68 only purports to list the Review Committee of the Maintenance Task Force. Accordingly, it is likely that Evangelista and other attorneys may have been part of the CS & M IV study. Nevertheless, it is of moment that Evangelista—who both Turner and Katzenbach stated was the senior in-house counsel assigned to CS & M IV—was not a member of the task force review committee.

Moreover, it should be observed that Sturges' deposition testimony regarding CS & M IV was very vague and imprecise. He could not recall very many of the people associated with this effort, he was unable to provide information about reports that it issued, and he could not recall whether counsel worked with the task force steering committee. More significantly, he testified that his role as secretary to the CS & M IV steering committee was relatively minor. This suggests that he had other business responsibilities while serving on the task force.

As to the Barr statement, defendant relies on the stipulation entered into between the parties during the hearings before the masters. The entire discussion regarding Barr's statement and Waygood's explanation during the hearing is reproduced in the margin.[28]

---

27. *Id.* at p. 277 L. 18 to p. 278 L. 5.

28. Tr. 302 L. 7 to Tr. 307 L. 3: [Messrs. Woghin and Carlson are counsel for plaintiff; Messrs. Waygood and Taylor are counsel for defendant].

MR. WOGHIN: I would just like to bring one item to the attention of the Court and Mr. Waygood. In our previous submission to IBM we had included all the documents and deposition testimony from the various witnesses that we planned to use. What we did not include at that time was the statement which was taken out of one of the previous depositions by Mr. Thomas Barr, attorney for IBM. The reason that that was not included was that it did not fall into the same category as the other documents that we included. I just bring it to IBM's attention that it is offered to be marked as Exhibit No. 47, the very first document in the second volume.

MR. WAYGOOD: I would have to object to that, your Honor. I have it before me now for the first time, I have not read it, but I think I can object anyhow. I don't think that statements of counsel in connection with a deposition bear on matters that we are considering here or are probative, with all due respect to Mr. Barr.

MR. CARLSON: With all due respect to Mr. Waygood, we have six affidavits by counsel already offered for the record, and I think statements of counsel are pertinent to the issue or may be pertinent to the issue before the Court.

MR. WAYGOOD: I think there is a difference between sworn testimony and statements in the course of a deposition.

MASTER MEYER: The deposition was under oath, was it not?

MR. WAYGOOD: Yes, but it was not of Mr. Barr.

MR. TAYLOR: This is Mr. Barr acting as counsel for the defendant during deposition.

MASTER McLAUGHLIN: Are you suggesting that statements by counsel made during a deposition do not bind his client? Is that your argument?

MR. WAYGOOD: I really had not reached in my own mind that point. Perhaps I could finish reading this and then understand the purpose for which it is offered and then respond to that.

MR. WOGHIN: I would just like to conclude by saying—

MASTER McLAUGHLIN: Why don't we let him read that.

MASTER MEYER: He cannot listen to you and read that at the same time.

MR. WOGHIN: I am sorry.

MR. WAYGOOD: May I understand at this point the purpose for which the plaintiff is offering the statement of Mr. Barr.

MR. WOGHIN: The statement is being offered as background for the Masters to put in context the claims that IBM is asserting with respect to CS&M–3 Task Force and CS&M–4 Task Force, and to try and relate those claims to the specific

Based on all the creditable evidence the court finds that the masters erred in finding 13 and accordingly finding 13 is rejected. In reaching this conclusion, the court has placed strong reliance on the Barr admission. Although defendant urges that the admission should be limited to the implementation phase (as explained in the stipulation), the court cannot accept this position. The Barr statement was clear and unequivocal. It asserted that CS & M III and IV were formed to consider and effectuate changes in the way in which IBM conducted its business. It concluded that although certain documents generated by these task forces were privileged because they reflected advice given by or sought from counsel, that in general no special privileged status could be granted to these groups. There was no implementation phase limitation. The statement referred to all documents stamped CS & M III or IV. Accordingly, not only finding 13, but all findings and conclusions according a general privileged status to CS & M III and IV must be rejected.

■ The remainder of the Government's objections to the masters' findings of fact all deal with the Office of Business Practices (OBP). Finding 17 is the first finding of fact concerning

---

documents, which other documents are being offered and will be offered.

MR. WAYGOOD: I object to the offering and the reception in evidence in this proceeding of this statement, since it is a statement of counsel not under oath and in the course of a deposition which he attended only for a few moments in the very early 1972. I feel compelled to go on and state, in the same respect and with the same weight that this might be accorded, that as the affidavits in this proceeding indicate, and of which I have firsthand knowledge myself, in excess of 106 containers of documents relating to CS&M-3 and -4 were produced and were made available to Control Data Corporation in connection with this litigation and were therefore by proxy in effect under the arrangement with the Department of Justice made available to the Department of Justice, and Control Data selected copies from those 106 cartons of CS&M-3 and -4 documents and those are in the possession of the Department of Justice. As to those documents, those portions of the work done in connection with CS&M-3 and -4 that were not privileged, which has been referred to in the affidavits as implementation work, we did not claim any privilege, we did produce the documents, 106 boxes of them, and that is what Mr. Barr is referring to in this statement.

I think, however, the statement should not be admitted and is not relevant to these proceedings. But to the extent that it is received as background or as anything else, I think it must be understood in the light of my statement and interpreted in the light of my statement.

I think the fact that Mr. Barr's statement is so ambiguous on its face is the vice of trying to put into the record as probative evidence a statement that was made in a different context, at a different time, in a different case.

MR. WOGHIN: I think I should point out for the record that, with respect to the statement by Mr. Barr, although Mr. Barr was at the deposition only for a short time, the record makes it clear that he attended the deposition for a specific purpose, and that was to make this specific statement. Although it may be argued by counsel for the defendant that it is ambiguous, I don't agree with that conclusion.

MASTER MEYER: It has some value as an admission made in the course of the legal proceeding by an attorney who was employed for the purpose of that particular proceeding. It has always, of course, the possibility of being explained. I think perhaps the thing to do would be to permit it to be marked in evidence, and if the Government is willing to agree, it is a shortcut to having to bring Mr. Barr in by agreeing that if Mr. Barr were called he would testify to what Mr. Waygood just said.

MR. CARLSON: No objection to that, your Honor.

MASTER MEYER: All right. Then, with that, that should take care of the matter, and we will pass on it by considering what you just said as stipulated testimony that Mr. Barr would give in explanation of the potential admission contained in the document.

OBP to which plaintiff objected. It states as follows:

> The Office was established at the instance of Burke Marshall (then Vice-President and General Counsel to IBM) and George B. Turner (a partner in the Cravath firm). Harold F. McGuire, Jr. (an associate with the Cravath firm) was assigned to direct and work with this group.

The Government contends that there was an absence of attorney direction for OBP. This controverts the assertion in finding 17 that "Harold F. McGuire, Jr. (an associate with the Cravath firm) was assigned to direct and work with this group."

It should be noted that this finding merely states that Mr. McGuire "was *assigned* to direct and work with this group." (emphasis added) It does not say that Mr. McGuire actually performed in any directorial capacity. Nevertheless, the implication is that Mr. McGuire worked with and directed OBP and the court will treat finding 17 as if it stated that McGuire performed the functions assigned to him. In paragraph 3 of his affidavit McGuire stated:

> One of my initial assignments by Mr. Turner was to direct and work with a group of IBM businessmen, *subsequently called* the "Business Practices" group, assembled under the direction of Mr. Turner and IBM's Vice President and General Counsel, Burke Marshall, to assist counsel. My responsibility consisted of directing a file search within IBM, conducted by this group, which eventually resulted in the transmittal to the Department of Justice of IBM documents that had been requested by it. These documents were given to the Department during the summer and fall of 1967. I was also assisted by IBM attorneys and other outside counsel.

McGuire did not aver that he directed OBP on a regular basis. All he said was that he directed a group of IBM businessmen in a file search and that this group was subsequently called the Business Practices group. The file search was not asserted to be work generated by OBP.

Additional support for the contention that the file search directed by McGuire was not part of the regular work of OBP is found in the hearing testimony of OBP member Otis Page.[29]

Support for the assertion in finding 17 that "Harold F. McGuire, Jr. (an associate with the Cravath firm) was assigned to direct and work with this group" is found in McGuire's affidavit and in the testimony of three of the five witnesses who gave testimony at the hearings before the masters.

As stated earlier, McGuire's affidavit does not support the assertion that he had any supervisory responsibility over OBP. Nevertheless, three witnesses stated that they had had contact with McGuire while they were working at OBP. Wilfred Carl Gamrath, a retired IBM official, who is currently receiving retirement benefits from defendant, testified that he had been assigned to work in OBP sometime in either June or July, 1967. When he first arrived at OBP he worked on document production. He asserted that "Skip [Harold F.] McGuire was [his] legal contact . . . ," in regard to his work (Tr. 111 L. 14–16). He testified further that he "received letters or memoranda from Mr. Seggerman [an IBM in-house counsel] . . . asking for something or wanting [him] to do something." (Tr. 116 L. 14–16). He also stated that he "might have received letters from Mr. McGuire and Mr. Schwarz." (Tr. 116 L. 16–17). He seemed more positive about Mr. Schwarz than Mr. McGuire. (Tr.

---

29. Page testified that in or about June, 1967, before he was offered a position with OBP, he participated in a document search that was directed by lawyers. Tr. 51 L. 19 to Tr. 53 L. 5. It seems apparent that this was the activity that Mr. McGuire referred to in paragraph 3 of his affidavit. *See* p. 172 *supra*.

116 L. 17–19). On cross-examination, by IBM counsel, Gamrath testified that during his tenure at OBP he worked with about ten lawyers including McGuire (Tr. 127 L. 2–8) and that he took "technical direction" from McGuire. (Tr. 125 L. 19).

The next witness who testified that he worked with counsel, including McGuire, while at OBP, was Stewart H. Greenfield. Although no longer employed by IBM, Greenfield stated that he is a stockholder of defendant. While working at OBP, Greenfield testified that he had discussions with a number of lawyers including McGuire, Seggerman and Schwarz. (Tr. 206 L. 13–17). On cross-examination he stated that he prepared reports at the request of these same three attorneys. (Tr. 222 L. 22 to Tr. 223 L. 2). Hilary A. Faw, Jr., testified that he is currently Assistant Treasurer of the IBM Corporation. (Tr. 226 L. 19–22). He stated that during his association with OBP he authored reports which "were directed to Mr. George B. Turner and to his associates, who were at that time working with him from Kravath, [sic] Swaine & Moore, and to Mr. Burke Marshall." (Tr. 243 L. 18–21).

In evaluating the part of finding 17 attacked by the Government, the court is satisfied that it is erroneous and must be rejected. Although there are bits and pieces of testimony suggesting that McGuire worked with OBP, it cannot be overlooked that McGuire failed to directly assert that he had a working relationship with OBP. Additionally, even those witnesses (Gamrath, Greenfield and Faw) who contended that McGuire worked with them generally referred to his work in connection with the document search rather than to OBP generated work.

■ The next finding objected to is finding 18, which states as follows:

Frank J. Cummiskey, an IBM employee, was the first director of the Office and *reported directly to Burke Marshall*. He was then joined by other employees including Hilary A. Faw (who later became Director of the Office), Otis S. Page, Carl Gamrath, Stuart E. Greenfield, Jerry Spector, William Wakeford, and Joseph Rogers (emphasis added).

The Government objects to the statement in finding 18 that Cummiskey "reported directly to Burke Marshall." At the time OBP was established, Marshall was Vice President and General Counsel of defendant. Plaintiff asserts that this statement is in conflict with PX–6A, which contains IBM Organization Directories dated January 1, 1967; April 30, 1967; July 31, 1967; November 15, 1967; July 18, 1969 and July 31, 1970. The Government contends that PX–6A demonstrates that OBP did not report to attorneys from the time of its creation —sometime between January and April 1967—until November 1967. From its creation until November 1967, OBP reported to Mr. Bullen, who was then Vice President and Group Executive, Corporate Controls and Services Staff. Additionally, plaintiff contends that the reporting relationship to attorneys, which it contends was not established until November 1967, ended in August 1969 when OBP again reported to Bullen.

The organizational charts reveal the following:

1. *Directory dated 01/31/67*—Does not show any organization within IBM called Office of Business Practices. For purposes of corporate structure B. Marshall (Vice President and General Counsel) is reporting to R. H. Bullen (Vice President and Group Executive).

2. *Directory dated 04/30/67*—Lists F. J. Cummiskey as "IBM Director of Business Practices," and shows him reporting to R. H. Bullen.

3. *Directory dated 07/31/67*—Lists three people under OBP: Cummiskey (director), W. C. Gamrath (manager) and O. S.

Page (consultant). OBP is shown in a reporting relationship with Bullen.

4. *Directory dated 11/15/67*—For the first time OBP is shown to have been in a reporting relationship to B. Marshall, Vice President and General Counsel.

5. *Directory dated 07/18/69*—Shows H. A. Faw, Jr. as "IBM Director of Business Practices" in a reporting relationship to N. B. Katzenbach, then Vice President and General Counsel.

6. *Directory dated 07/31/70*—Lists Faw (IBM Director of Business Practices) as reporting to Senior Vice President Bullen.

Sometime between July 18, 1969 and July 31, 1970, OBP resumed its reporting relationship to Bullen. Plaintiff offered PX–6 to show that this shift from the general counsel's office to Bullen occurred in August 1969. In relevant part, PX–6 contains a chart of the Office of the Senior Vice President (R. H. Bullen). The chart indicates that the IBM Director of Business Practices (H. A. Faw, Jr.) reported to Bullen.

PX–6 and PX–6A show the OBP reported to Bullen from the time it was created until November 1967. From November 1967 until August 1969 OBP reported to the Office of Vice President and General Counsel. Thereafter, it again reported to Bullen. Accordingly, the Government maintains that finding 18 is erroneous since it fails to reflect these shifts in reporting relationships.

As with all the masters' findings, the major evidence supporting finding 18 is contained in the affidavits of IBM counsel. After stating that upon the advice of Cravath, Swaine & Moore he decided to establish a small group of IBM businessmen to assist counsel,[30] Mr. Marshall averred as follows:

The permanent group which I established was given the name Office of Business Practices, a corporate headquarters department (for organizational and accounting purposes) and not to be confused with a department which I understand had the same or a similar name in the Data Processing Division of IBM. It was headed initially by Frank Cummiskey, who reported directly to me as General Counsel of the Corporation. Shortly after this group was set up it became clear that an area in which the lawyers particularly needed assistance involved financial matters. Mr. Hilary A. Faw, Jr. had had extensive experience in this field. In early 1967 Mr. Faw, who was then an Assistant Treasurer, joined the group. During the summer of 1968 Mr. Faw became the head of that group and was given the title Director of Business Practices. The group worked only for me and the Cravath firm, under our direct supervision, and had no business responsibilities.

The second sentence of the above excerpt apparently is the basis for the statement in finding 18 that Cummiskey "reported directly" to Burke Marshall.

In further support of finding 18, defendant argued that plaintiff's reliance on the organizational directories was

---

30. Marshall affidavit ¶ 5 provides:

5. At the request of, and pursuant to the advice of, IBM's outside counsel, Cravath, Swaine & Moore, I decided as General Counsel of IBM that it would be necessary to set up a small group of knowledgeable businessmen who would have as their exclusive function assistance to our duties as IBM's legal representatives. As outlined in greater detail below, this involved the essentially inseparable tasks of analysis and advice concerning matters raised in the investigation and in the threatened and later actual litigation, including IBM's current business practices, its future plans, technologies, etc. As the Department's investigation progressed, it also involved work in connection with information and documents demanded by and furnished to the Department.

misplaced.[31] Defendant contended that the directories were inaccurate,[32] that they did not purport to show when a reporting relationship was established and that OBP was not established to assist IBM's internal Legal Department but rather to aid outside legal counsel. Thus, it is argued that the failure of the directories to show a reporting relationship to the Office of Vice President and Legal Counsel is insignificant.

██ Having reviewed the evidence supporting and contradicting finding 18, the court is convinced that finding 18, inasmuch as it purports to find attorney direction of OBP by Burke Marshall, is clearly erroneous. The court recognizes that the organizational directories relied on by plaintiff may be inaccurate. On the other hand, the major evidence supporting this finding is contained in an affidavit of an interested affiant. Where, as here, the court must choose between contemporaneous documents or the hindsight observations of an interested witness, the court is constrained to choose the former. Consequently, finding 18 is modified as follows: During the period between November 15, 1967 and August 1, 1969 OBP was directed by counsel. At all other times it was directed by IBM businessman R. H. Bullen.

██ The last finding specifically objected to by the Government is finding 21. In attacking finding 21, however, plaintiff suggests that findings 19 and 22 must also be rejected.

---

31. Memorandum in Response to Plaintiff's Motion to Set Aside and Amend the Final Report of Special Masters After Evidentiary Hearing of October 24 and 26, 1973, at 23–25.

32. In addition to the argument cited in note 31 *supra*, three witnesses at the hearing testified that the Organizational Directories were inaccurate. *See Gamrath*-Tr. 100–02, *Greenfield*-Tr. 202–04, *cf. Bullen*-Tr. 181.

33. This document is a memorandum to Mr. G. B. Beitzel from H. A. Faw, Jr. (the document is signed by Mr. Spector) dated November 27, 1968. The subject of the memo

*Finding 21:*

Except as the content of the document or the file source from which it was produced, as shown by the listings, otherwise indicates, there is no evidence that the reports emanating from the Office of Business Practices were circulated to people other than members of that office and IBM counsel.

*Finding 19:*

The sole purpose of the Office was to assist IBM's counsel in connection with the Department of Justice litigation. The members of the Office had no business responsibilities during this time.

*Finding 22:*

From February or March, 1967 until late 1970 Mr. Faw was relieved of all business responsibilities in IBM (with two possible but irrelevant exceptions), and was detailed, for that three-year period to work with counsel both in the Office of Business Practices and the various CS & M task forces. Mr. Faw was the principal IBM executive coordinating the efforts of counsel and the IBM businessmen.

Simply stated, the Government's attack on findings 19, 21 and 22 is that a document,[33] which IBM claimed was privileged and which related to the admittedly nonprivileged Project Yardstick [34] was generated from within

---

was "Change in Methodology in Share Measurements." Carbon copies were sent to twelve other IBM employees. The memorandum deals with the so-called IBM "Project Yardstick." *See* note 34 *infra*.

34. Project Yardstick was discussed in paragraph 10 of the Turner affidavit. Although IBM originally claimed a privileged status for this project, the claim was eventually dropped. Turner affidavit ¶ 10 states as follows:

10. In about May of 1968, in connection with my preparation for continuing conferences with the Department of Justice and

OBP, and was distributed to IBM businessmen outside OBP. Accordingly, the Government contends that OBP was not established solely to assist counsel as reflected in finding 19. This seems apparent from the fact that members of OBP were involved in Project Yardstick. Moreover, since this document (the Faw to Beitzel memorandum described in footnote 31) was circulated to IBM personnel outside OBP, finding 21 is also negated. Lastly, since the author of this document is H. A. Faw, Jr., finding 22 seems questionable.

IBM responded to these arguments by pointing out that this document was mistakenly listed as privileged and that it had in fact been produced to the Government numerous times. Moreover, defendant contends that Mr. Faw was interested in Project Yardstick because Mr. Turner stated that Project Yardstick "was well worth pursuing from a legal standpoint, as well as from the standpoint of whatever business motivations had originally given rise to the project." (Turner Affidavit ¶ 10).

Additionally, IBM points to testimony indicating:

(1) that the sole purpose of OBP was to assist IBM's counsel and that OBP was directed by counsel (*Page*-Tr. 58 L. 23 to Tr. 59 L. 17, Tr. 80 L. 6 to Tr. 81 L. 11; *Gamrath*-Tr. 96 L. 9–14, Tr. 106 L. 12–19, Tr. 108 L. 3–10, Tr. 111 L. 9–16, Tr. 16 L. 10–20, Tr. 126 L. 20 to Tr. 127 L. 25; *Bullen*-Tr. 177 L. 10 to Tr. 178 L. 8, Tr. 179 L. 13–20; *Greenfield*-Tr. 205 L. 3 to Tr. 207 L. 6, Tr. 222 L. 18 to Tr. 223 L. 4, *Faw*-Tr. 232 L. 23 to Tr. 234 L. 11, Tr. 243 L. 11–21) and (2) that reports and other materials emanating from OBP were maintained under tight security with access restricted to OBP members and counsel (*Page*-Tr. 65 L. 5 to Tr. 69 L. 22, Tr. 81 L. 12–25; *Gamrath*-Tr. 109 L. 9 to Tr. 114 L. 9; *Greenfield*-Tr. 215 L. 2–25, Tr. 219, L. 5–21, Tr. 223 L. 5–19; *Faw*-Tr. 246 L. 7 to Tr. 247 L. 19).

Viewing the entire record the court believes that the Government has amply demonstrated that OBP members were involved in Project Yardstick. Accordingly, the masters' basic finding that OBP was established by counsel for counsel must be rejected. Therefore, findings 19 and 21 are rejected as clearly erroneous. Since H. A. Faw, Jr. was involved in Project Yardstick, finding 22 must also be rejected. Although the masters may have thought that Faw's Yardstick involvement was an irrelevant exception to his nonbusiness status, the court cannot agree with this proposition. Since finding 22 fails to reflect Faw's business activities during the time he served on OBP, it is deficient.

The masters' conclusions of law are generally mixed questions of fact and law predicated on the findings of fact. Since the court has refused to adopt

---

the assembly of data requested by it, I became aware that certain IBM businessmen were proposing a further attempt to make more complete and accurate IBM's methods of compiling statistics on EDP installations and orders. This project, I learned, had been given the name "Yardstick". I was naturally aware of the need for accuracy in such statistics and just shortly before that time had written a letter to the Department of Justice in connection with figures based upon clearly erroneous statistics. I, therefore, urged Burke Marshall that any project which could make such statistics more accurate was well worth pursuing from a legal standpoint, as well as from the standpoint of whatever business motivations had originally

given rise to the project. Mr. Marshall assigned one of Mr. Faw's assistants, who was also at that time working full time with inside counsel and my firm, to follow the progress of the "Yardstick" project. From time to time during 1968, this individual reported to me, Mr. Marshall, or one of my firm's associates, on the project's progress, and Mr. Marshall, one of my firm associates or I from time to time advised him concerning specific changes in or refinements to the proposed project which we believed desirable. We also instructed him to convey our advice to the businessmen within IBM who were actually engaged in setting up the new "Yardstick" methods of compiling statistics.

many of the masters' findings of fact, the conclusions ,of law must necessarily be modified. Accordingly, rather than discuss the Government's objections to specific conclusions of law, the court will merely state its rulings on each conclusion.

Conclusion I states, "The four CS & M task forces were created under the guiding hand of counsel to · prepare for litigation, either pending or anticipated." This conclusion is modified so as to exclude CS & M III and IV.

Conclusion II states, "The Office of Business Practices was similarly created to prepare for litigation, either pending or anticipated." In view of the court's ruling with respect to findings 19, 21 and 22, this conclusion must be rejected.

Conclusion III A states as follows:

The evidence presented establishes that the work of the four task forces and the Office of Business Practices was *primarily* related to litigation (either pending or anticipated or the obtention of legal advice.

(emphasis added)

In view of the rulings of the court on the masters' findings of fact, it seems clear that this conclusion must be rejected with regard to CS & M III and IV and OBP. The masters appeared hesitant about stating that the exclusive function of the task forces and OBP was assistance to counsel. This is apparent from their use of the word *"primarily"* in conclusion III A.

Conclusion III B states:

The evidence presented establishes that for the purpose of protecting the confidentiality of the documents the personnel of the task forces and of the Office of Business Practices and the documents used and prepared by them were sufficiently segregated from the rest of IBM personnel and their business records. Although oral progress reports were occasionally made to IBM executives not connected with the task forces or the Office of Business Practices, these communications were guarded and were made in the presence of counsel in order to keep the senior echelon of IBM management apprised of legal developments.

As to the CS & M III and IV and OBP this conclusion must be rejected.

Conclusion III C provides:

Documents generated by the four task forces and the Office of Business Practices are therefore privileged either as work product or as communications between attorney and client unless the content of the document establishes that the purpose of the document was other than litigation or the obtaining of legal advice or unless the content of the document or the file source from which it came, as stated in the listings, establishes that the requisite confidentiality has not been maintained.

■ In this conclusion the masters' accord a general privileged status to the task forces and OBP predicated on their findings of fact that these groups were established by counsel to assist in the defense of anticipated or pending litigation or in the obtainment of legal advice. On the other hand, the masters sought to limit application of this privileged status on two grounds: First, if the content of a particular document established that the ·purpose of the document was not related to litigation or obtainment of legal advice, and secondly, if the requisite confidentiality was breached with regard to a particular document. The attempt to limit the application of the privileged status on these grounds appears to be inconsistent with the purpose of according a general privileged status to the groups in question. Moreover, the exceptions tend to undermine the masters' findings of fact. In establishing their scheme to review documents the masters accorded a privileged status to all documents generated by the task forces and OBP and created exceptions for withdrawal of this privileged

**178**

status. In view of the rulings of the court, it seems that the scheme set forth by the masters should be reversed—*i. e.*, all documents should be considered not privileged unless it can be concluded, from the face of the document or from the context, that a document is, in fact, privileged. This is the customary procedure by which documents are reviewed for claims of privilege. Accordingly, conclusion III is rejected.

■ Conclusion IV states:

Even though such a document was not prepared for the present litigation, the document is privileged as work product if it was prepared for a lawsuit involving substantially identical issues.

This conclusion is rejected. Although there is a split in authority on this point (*see* 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2024, at 200–202 (1970), *compare* cases cited at n. 26 *with* those listed at n. 27), this court is of the view that for something to be considered "trial preparation material" (work product) under Fed.R.Civ. P. 26(b)(3) it must be prepared "in anticipation of litigation or for trial" in the case in which the special immunity accorded to such material is sought. This view was articulated by Chief Judge Sheridan in Honeywell, Inc. v. Piper Aircraft Corp., 50 F.R.D. 117 (M. D.Pa.1970), in which it is stated:

An attorneys' memorandum in a prior case involving different parties does not have the protection of the "work product" principle. 4 Moore, Federal Practice para. 26.23 [8.–3] at p. 1436 (2d ed.). Hanover Shoe, Inc. v. United Shoe Machinery Corp., supra, [207 F.Supp. 407]; Tobacco & Allied Stocks, Inc. v. Transamerica Corp., D. Del.1954, 16 F.R.D. 534; Cf. Republic Gear Co. v. Borg-Warner Corp. 2 Cir. 1967, 381 F.2d 551.

50 F.R.D. at 119.

Conclusion V states:

In all cases where such a document went from an IBM employee to an attorney (or his agent), or vice versa, the attorney-client privilege will attach unless the document reflects solely a business judgment (rather than a purpose to obtain legal advice or aid in litigation) and except in those cases where the content of the document or the file source from which obtained, as stated in the listings, establishes that the requisite confidentiality has not been maintained.

■ Conceivably, this conclusion extends the attorney-client privilege to every IBM employee. It does, however, have the same exceptions as stated in conclusion III C. Notwithstanding the exception, which would require an unspecified degree of confidentiality, the court is of the view that conclusion V should be rejected. The court has made a thorough study of the various theories that have been developed to apply the attorney-client privilege in the corporate context. The court is of the view that the "control group" theory, first articulated by Judge Kirkpatrick in City of Philadelphia v. Westinghouse Electric Corp., 210 F.Supp. 483 (E.D.Pa.1962), provides the most satisfactory solution to the problem. *See* Note, Attorney-Client Privilege for Corporate Clients: The Control Group Test, 84 Harv.L.Rev. 424 (1970). Consequently, the masters are directed to apply the "control group" theory to the assertions of attorney-client privilege by defendant.

Conclusion VI A states:

In those cases where the document went from one IBM employee to another, the document is entitled to protection as work product except insofar as the document reflects a business judgment. It may also be entitled to the protection of the attorney-client privilege if it was transmitted through the line of corporate commu-

nication as either legal advice received or data prepared as a basis for the rendition of legal advice.

■ In view of the court's prior discussion and rulings this conclusion is rejected. The second sentence of conclusion VI A is amply covered by the court's ruling on conclusion V. As to the first sentence, which deals with work product, the masters are directed to review each document to determine whether work product immunity should be accorded. This must be revealed from the face of the document or from the context in which the document is presented for review. In other words there will be no assumption that a document is work product merely because it went from one IBM employee to another.

Conclusion VI B states:

A document which is not protected by the attorney-client privilege but which is privileged as work product may nevertheless be reached if the Government can demonstrate to the Masters that it "has substantial need of the materials" and that it "is unable without undue hardship to obtain the substantial equivalent of the materials by other means." F.R.Civ.P. 26(b)(3). The Government will be afforded opportunity for such a hearing by the Masters in any decision holding particular documents to be privileged as work product.

This conclusion is adopted.

Conclusion VII (which the masters' report mislabeled VIII) states:

In making recommendations to the Court regarding the validity of claims of privilege asserted with respect to particular documents, a Master shall recommend that a document be found "wholly privileged" or "wholly non-privileged" or "privileged in part" and as to any document in the last category shall (a) indicate by enclosing within red ink brackets marked upon the document those portions of the document which he recommends be found privileged and be excised from the document before disclosure of it, and (b) shall file all such "privileged in part" documents under seal with the Clerk of the Court at the time of filing of his report on such documents.

This conclusion is adopted.

## IV. IBM OBJECTIONS

Defendant objects to certain language in finding 21, conclusion III C and conclusion V.[35] Since the court has rejected finding 21 and conclusions III C and V, it is unnecessary to rule on defendant's specific objections. The masters, however, are free to take any relevant matter—including the file source from which a document was withheld—into consideration in making recommenda-

35. The language that defendant objects to is italicized in the excerpts from the masters' report produced below.
*Finding 21*
Except as the content of the document or *the file source from which it was produced, as shown by the listings,* otherwise indicates; there is no evidence that the reports emanating from the Office of Business Practices were circulated to people other than members of that office and IBM counsel.
*Conclusion III C*
C. Documents generated by the four task forces and the Office of Business Practices are therefore privileged either as work product or as communications between attorney and client unless the content of the document establishes that the purpose of the

document was other than litigation or the obtaining of legal advice or unless the content of the document or *the file source from which it came, as stated in the listings,* establishes that the requisite confidentiality has not been maintained.
*Conclusion V*
In all cases where such a document went from an IBM employee to an attorney (or his agent), or vice versa, the attorney-client privilege will attach unless the document reflects solely a business judgment (rather than a purpose to obtain legal advice or aid in litigation) and except in those cases where the content of the document or *the file source from which obtained, as stated in the listings,* establishes that the requisite confidentiality has not been maintained.

180

tions to the court on defendant's asserted claims of privilege.

The masters are directed to review the assertions of privilege by defendant for the documents generated by the CS & M task forces and OBP in conformance with this opinion.

So ordered.