UNITED STATES of America,

v.

John BRENNAN and United States
Aviation Underwriters, Inc.,
Defendants.

No. CR–95–0420 (CPS).

United States District Court,
E.D. New York.

May 1, 1996.

Edward A. McDonald, New York City, for John Brennan.

David M. Zornow, Skadden, Arps, Slate, Meagher & Flom, New York City, Clifford M. Sloan, Wiley, Rein & Fielding, Washington, DC, for U.S. Aviation Underwriters, Inc.

Sean F. O'Shea, Sean F. O'Shea, New York City, for U.S.

## MEMORANDUM AND ORDER

SIFTON, Chief Judge.

This is a prosecution against United States Aviation Underwriters, Inc. (USAU) and its former president and CEO, John Brennan, on 43 separate counts of mail fraud under 18 U.S.C. § 1341. The defendants have jointly moved for dismissal of the indictment on the grounds that the prosecution involves an extension of the mail fraud statute into an area that has been pre-empted by the McCarran–Ferguson Act, that the prosecution is barred by the statute of limitations, that the indictment fails to allege the elements of mail fraud, and that it is the product of breaches of the attorney/client privilege. For the reasons stated below, the motions for dismissal are denied or deferred for post-trial hearing.

## BACKGROUND

According to the indictment, USAU is a large insurance underwriting company, providing insurance for airlines, aircraft products, and aviation-related risks. In the period covered by the indictment, USAU also managed claims and accounting for a consortium of fourteen large insurers known as the United States Aircraft Insurance Group (USAIG). Brennan was the President, Chairman, and Chief Executive Officer of USAU.

### The Aviation Insurance Industry

Because of the magnitude of the potential liability flowing from plane crashes, insurers known as "coinsurers" or "concurrent insurers" regularly combine in a "vertical placement" to provide coverage and minimize individual exposure. To further reduce exposure of individual insurers, the coinsurers may also "reinsure" portions of their risk arising from any individual insurance contract. The reinsurers may, in turn, contract to further spread the risk with other reinsurers, known as "retrocessionaires."

These coinsurers then select a "lead" insurer which, in exchange for a fee, manages claims and litigation arising under the policies. No matter how dispersed the risk, the coinsurers, reinsurers, and retrocessionaires rely on the lead insurer to manage claims arising from the insured. The indictment alleges that a lead insurer owes a fiduciary duty both to the insured and to the other insurers.

### Facts Giving Rise to the Indictment

The indictment arises out of USAU's management of litigation stemming from the December 7, 1987 crash of Pacific Southwest

Airlines (PSA) flight 1771 en route from Los Angeles to San Francisco. During the flight, a recently terminated employee murdered the crew and the supervisor who had fired him. The crash killed all 43 passengers as well. Lawsuits were filed against the Los Angeles Airport Authority, PSA, USAir (PSA's owner), and Ogden–Allied, the company responsible for airport security.

USAIG and six other coinsurers insured USAir. USAU acted as lead insurer for all six coinsurers of USAir's risk. As underwriting manager for USAIG, USAU underwrote USAIG's 29% share of USAir's risk for PSA 1771. However, it reinsured the entire risk, and consequently USAIG had no exposure for any damages imposed on USAir. USAIG also insured Ogden–Allied, but USAU only reinsured 25% of USAIG's losses up to $7.5 million on the policy. Losses in excess of that amount were covered by catastrophic excess reinsurance.

According to the indictment, officials of USAir expressed concern about a possible conflict of interest resulting from USAU's control of litigation on behalf of both USAir and Ogden–Allied. The indictment alleges that USAU assured USAir that the liability would be fairly apportioned but that USAU never disclosed to USAir, the coinsurers, reinsurers, or retrocessionaires that it had a direct financial stake in allocating responsibility to USAir in preference to Ogden–Allied.

Many of the lawsuits arising from the crash were settled prior to the trial. Trial as to the remaining parties began on May 31, 1989. The indictment alleges that, after the close of evidence but before a jury verdict was returned, USAU and Brennan, in order to perpetrate the fraud, settled the case and assumed control of the allocation of liability between USAir and Ogden–Allied. Subsequently, USAU and Brennan allocated 100% of the liability to USAir. It is further alleged that the defendants failed to disclose to the coinsurers material facts bearing on the liability of Ogden–Allied for the crash and made affirmative misrepresentations concerning USAir's and Ogden–Allied's relative exposure to damages. When USAir questioned this allocation, the defendants allegedly made further misrepresentations and material omissions intended to mislead USAir as to the extent of Ogden–Allied's trial exposure, the likelihood that the jury verdict would have been returned against USAir alone, and the likelihood of getting Ogden–Allied to pay any portion of the claims.

The indictment alleges that between 1987 and June 1992, the defendants, "together with others known and unknown to the grand jury," knowingly and willfully devised a scheme to defraud USAir and certain of the concurrent insurers, reinsurers and retrocessionaires by means of false and fraudulent pretenses, representations, promises, and the concealment of material facts in order to obtain money and property. In furtherance of this scheme, the defendants allegedly sent and received mail which traveled through the Eastern District of New York. The superseding indictment lists forty-three separate mailings, identified by approximate date of mailing, sender, recipient, and type. Each of these mailings constitutes a separate count of the indictment.

### Facts Relating to Defendants' Claim of Privilege

During the investigation of this matter, the government was also looking into USAU's management of litigation arising out of another airline crash. The probe led the FBI to interview Robert Alpert, a former employee of USAU. Alpert began working for USAU in 1973 as a claims attorney. When he left in 1989, and during the period covered by the indictment, he was Director of Claims. The parties agree that Alpert managed the USAir litigation as well as the other litigation under investigation, but they dispute the extent of his responsibility, involvement, and his actual role.

On November 16, 1992, a grand jury for the Eastern District of Virginia issued a subpoena for Alpert's testimony regarding USAU's handling of claims arising out of the other crash. An FBI 302 reveals that when AUSA Dennis Kennedy of that District phoned Brennan to inform him that the subpoena had been issued, Brennan "insisted that an attorney/client privilege existed between Alpert and USAU." USAU's counsel sent a letter to Kennedy the next day asking

that the subpoena be withdrawn and the investigation deferred until the issue of attorney/client privilege could be resolved.

In a November 18, 1992 [1] interview with Special Agent Peter Murray of the FBI's field office in Washington D.C., Alpert informed Murray that USAU had asserted the attorney/client privilege.[2] Alpert further stated that he did not feel it was a valid claim of privilege but that the issue needed to be resolved before he could testify. Alpert then proceeded to give Murray an account of his handling of the PSA matter among other things.

For reasons not revealed by any party, Alpert never testified in Virginia. Murray instead phoned Special Agent David Edwards in the Melville, New York office and referred the investigation to him. Edwards contacted Alpert and scheduled an interview with him on February 5, 1993. At this meeting, Alpert notified Edwards of USAU's claims of attorney/client privilege and reiterated his belief that he had not acted as an attorney. The government characterizes this interview and others as guarded, abstract, and hypothetical to avoid the breach of any privilege.

Edwards and Sean O'Shea, an Assistant United States Attorney for the Eastern District of New York, thereafter interviewed Alpert on several occasions with respect to USAir and the other airline disaster under investigation without informing USAU. As a result of these meetings, the government states it became convinced that (i) Alpert did not act as an attorney with respect to USAU and (ii) even if he had, the communications fell within the crime-fraud exception.

On February 9, 1993, the government interviewed one of Alpert's subordinates, David Zoffer, regarding substantially the same matters. Zoffer is also an attorney. However, since the parties' focus is on Alpert, Alpert's contacts with the FBI will control this analysis except where noted.

At some point in February, the government is said to have approached USAU and asked the company to waive any privilege with respect to Alpert's testimony. USAU refused. On February 12, 1993, the government served Alpert with a subpoena to testify before a grand jury.[3] By letter dated February 17, 1993, Alpert advised USAU and Brennan that he had been subpoenaed and that he anticipated questions about USAir and the other matter. USAU instructed Alpert to claim the attorney/client privilege. In the meantime, the government continued to meet with Alpert.[4]

On the same day that the government subpoenaed Alpert, it served a subpoena *duces tecum* on General Re, USAU's parent company. The subpoena was reissued on March 27, 1993, to narrow its scope. USAU produced documents on March 27 and April 21 in response to these subpoenas but withheld others claiming attorney/client and attorney work-product privilege on its own behalf and on behalf of Ogden–Allied.[5]

---

1. The chronology of the events relating to the subpoena is somewhat confused. The government's first submission refers to a November 18, 1992 meeting followed by a subpoena. However, its next submission specifies that the subpoena was issued on November 16, 1992.

2. USAU has produced a letter that Brennan wrote to Alpert advising him that:

 we hereby notify you that USAU and USAIG do not waive and specifically object to your revealing or using and [sic] "confidences" or "secrets" obtained by you in your capacity as an attorney for USAU or USAIG, or any insured of USAIG.

 Letter from John Brennan to Robert Alpert dated October 19, 1992.

3. Judge Platt of this Court eventually issued an order to compel Alpert's testimony in front of the grand jury. This order says that this subpoena was issued on March 25, 1993.

4. The government's meetings with Alpert in 1993 took place on February 24, March 12, 15, and 16, April 5, and July 6. For unspecified reasons, these interviews were apparently not memorialized on FBI form 302s.

5. USAir never asserted any privileges and apparently spoke freely about the matter from the investigation's inception. On February 25, 1993, USAU advised the government, through its law firm, that "USAU has no objection to Mr. George Manfredi's [the California lawyer that USAU retained to defend USAir in the PSA litigation] testifying before the grand jury in the United States District Court, Eastern District of New York."

Five months after serving the subpoena on Alpert, the government moved to compel Alpert's testimony before the grand jury regarding the other airline disaster "and other matters" on the ground that the communications fell within the crime-fraud exception to the attorney/client privilege. Representatives of USAU and of the other airline involved appeared at a hearing on the issue on November 19, 1993, before Judge Platt. At the hearing, David Zornow, counsel for USAU, expressed his concern that "there are other matters and that there may be other insureds that should be notified." Judge Platt instructed AUSA O'Shea that it was his duty to "notify any other interested party who is not alerted to what is going on here . . . ."

On February 16 and 23, Judge Platt issued decisions under seal with respect to Alpert's testimony. The contents of the decisions were not disclosed to USAU or the other airline whose representatives appeared before Judge Platt. The day after the order was entered, USAU and the other airline requested a stay pending an appeal of the order. The same day, the government advised the court and defendants that the stay was moot for reasons that the government would only reveal under seal at the court's request. Judge Platt issued a memorandum and order that day that, even if the stay were not moot, there would be no basis for granting it. USAU inferred that the government had already elicited the desired testimony and discontinued its appeal.

The government interviewed Alpert on at least five occasions between March and June 1994. By letters dated May 31, June 27, and August 26, Zornow provided the government with a privilege log of approximately 94 documents withheld by USAU, all of which related to the other matter and not to USAir. On August 17, 1994, Ogden–Allied formally waived its attorney/client privilege, and USAU released documents it withheld on behalf of Ogden–Allied and continued to withhold its own documents.[6]

Alpert's grand jury testimony took place on September 21, 1994. He was interviewed four more times between November 21, 1994, and April 11, 1995. Although defendants knew that Alpert had some contact with the government, they maintain that, until the FBI turned over its notes on August 22, 1995, they knew of no contact before the grand jury subpoena was issued, were unaware of the extensive contact throughout the period from February 1993 through April 1995, and believed that all communications were limited to the other crash, not USAir.

## DISCUSSION

The defendants jointly move to dismiss the indictment and the superseding indictment on the ground that they are based on the theory that a fiduciary duty existed between USAU and its insureds, coinsurers, reinsurers, and retrocessionaires which as a matter of law does not exist. If such a duty is found to exist defendants contend that the prosecution is pre-empted by the McCarran–Ferguson Act, that the prosecution is barred by the applicable statute of limitations, that the indictments fail to allege conduct upon which a mail fraud prosecution may be maintained, and that they were obtained in violation of the attorney/client privilege. Each of these motions is considered below.

### The Existence of a Fiduciary Duty

Both the original and superseding indictments allege in nearly identical language that "[t]he 'lead insurer' owes a fiduciary duty of loyalty to other insurers involved in a vertical placement, the coinsurers, the retrocessionaires and its insured." Indictment at ¶ 6; see also Superseding Indictment at ¶ 6. The indictment contemplates four possible fiduciary relationships: (i) that between USAU and its insureds, (ii) that between USAU and its concurrent insurers, (iii) that between USAU and its own reinsurers and retrocessionaires (the "primary reinsurers"), and (iv) that between USAU and its concurrent insurers' reinsurers and retrocessionaires (the "secondary reinsurers"). Defendants maintain that, because USAU owed none of these

---

**6.** The government states without contradiction that Ogden–Allied's general counsel, Isaac Palm-

er, orally waived the privilege in June 1993.

entities or groups a fiduciary duty, the indictment is insufficient and must be dismissed.[7]

The government and the defendants have assumed without discussion that state law, rather than federal law, controls the disposition of this issue. The parties have further assumed that the relevant state is New York. Where a defendant in a federal mail fraud prosecution has disputed the existence of a fiduciary duty, the Second Circuit has resolved the dispute by applying federal law, drawing however on the law of various states and the common law.[8] *United States v. Margiotta*, 688 F.2d 108, 122 (2d Cir.1982); *see also United States v. Chestman*, 947 F.2d 551, 568 (2d Cir.1991).

A complication in *Margiotta*, also present in this case, is whether the use of a federal fiduciary standard offends principles of federalism. In *Margiotta*, a potential federalism conflict emerged because the federal prosecution sought to hold a state republican party chairman, who did not hold public office, accountable for his conduct as a "de facto public leader." *Margiotta*, 688 F.2d at 123. The *Margiotta* court recognized that

> [t]heoretically, the application of the federal mail fraud statute to state and local politicians raises federalism concerns. In fact, Margiotta has argued that if New York state does not require individuals who are not public officeholders to act in a disinterested manner, a federal court's application of such a requirement constitutes an improper intrusion into the governmental affairs of New York state, as well as the county and local governments.

*Id.* at 124. The court, however, declined to reach the issue because it found the duty to exist under New York State law. *Id.*

■ In this case, the conflict is less abstract. The McCarran–Ferguson Act (the "Act") provides that "the business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 15 U.S.C. § 1012(a). The Act also requires that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance...." 15 U.S.C. § 1012(b). Although the Act does not bar a federal mail fraud prosecution, *see, e.g., United States v. Cavin*, 39 F.3d 1299 (5th Cir.1994), it does impose on federal courts an affirmative duty to refrain from imposing additional or inconsistent obligations taking into account those imposed by the law of the relevant state. *Cf. Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (court should not federalize fiduciary standards absent clear congressional intent even though "[f]ederal courts applying a federal fiduciary standard ... could be expected to depart from state fiduciary standards at least to the extent necessary to ensure uniformity within the federal system.").

■ Having decided that state law does, in fact, supply the standard for determining whether USAU owed fiduciary duties to the purported victims, the remaining question is which state's law to apply. Here again, it seems apparent as the parties recognize that McCarran–Ferguson requires this Court to apply New York law. To draw on conflicting principles from federal cases or the law of other states would necessarily mean that inconsistent or additional standards would be brought to bear to the regulation of insur-

---

**7.** Defendants' motion is in one sense untimely. On July 26, 1995, this Court ordered the parties to file substantive motions by mid-September. On November 1, 1995, a second round of motions was scheduled to address issues raised by the superseding indictment. Since the existence of a fiduciary duty has been a primary allegation since the original indictment was filed, this issue should have been addressed in the first round of motions. The defendants assert that the government changed the indictment and the theory of its prosecution. Whether or not the superseding indictment added a new dimension to the importance of a fiduciary duty, thus excusing the delay

in raising the issue, this Court will address the question on the merits since it is of the type which may be raised at anytime.

**8.** Other spheres in which the existence and scope of a fiduciary duty are matters of federal concern are ERISA and § 523(a)(4) of the Bankruptcy code. The analysis under each of these statutes continues to be informed by state and common law. *See, e.g., Varity v. Howe*, —— U.S. ——, ——, 116 S.Ct. 1065, 1070, 134 L.Ed.2d 130 (1996); *F.D.I.C. v. Wright*, 87 B.R. 1011 (D.S.D. 1988) (bankruptcy).

ance. Because USAU is a New York corporation whose business is subject to regulation by New York State law, the law of other states or federal cases generally bears on its activities only to the extent that New York would permit it.

 New York would only apply the law of other states where a conflict of laws analysis required it to do so. Because this case arises out of USAU's performance of its contracts with the purported victims, New York would apply the "paramount interest" test. The law of the "jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining state interests are those which relate to the purpose of the particular law in conflict." *Intercontinental Planning Ltd. v. Daystrom*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 582 (1969). Under this rule, it is clear that New York would apply its own law. This prosecution implicates New York's interest in maintaining its preeminent position in the national and international business community by providing a measure of security and confidence to those doing business with New York firms.[9] The other states arguably implicated by the fraud alleged in this indictment have no demonstrable interest in regulating the conduct of New York insurance companies.[10] Accordingly, although the law of other states may be helpful in fleshing out some of the

relationships where New York law is silent, New York's law ultimately determines whether a fiduciary duty was owed.

*General Considerations Governing Fiduciary Duties*

 New York has an expansive concept of fiduciary duty. *Schmidt v. Bishop*, 779 F.Supp. 321, 325 (S.D.N.Y.1991).

> Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another.... Such a relationship might be found to exist, in appropriate circumstances, between close friends ... or even where confidence is based on prior business dealings.

*Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900, 902 (2d Dept.1976), *appeal dismissed*, 42 N.Y.2d 908, 397 N.Y.S.2d 1004, 366 N.E.2d 1358 (1977).[11] Although the existence of a fiduciary relationship is normally determined by the jury, *United States v. Reed*, 601 F.Supp. 685, 705 (S.D.N.Y.) (judges may determine question only on "scarce" occasions where it is clear that rela-

---

**9.** If USAU's conduct were characterized as fraud for the purposes of this analysis, the result would be no different. When deciding which state's law applies to tort cases, New York examines whether the conflicting laws are "loss-allocating," such as contribution or indemnification, or "conduct-regulating," such as strict liability. *Schultz v. Boy Scouts of America*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 686 (1985). New York applies its own conduct-regulating laws to conduct occurring within its borders. *Id.* Even though the underlying civil case was tried and settled in California, the fraudulent conduct alleged in this prosecution was Brennan and USAU's decision to allocate liability solely to USAir. The evidence referred to by both sides makes apparent that this decision was made in New York.

**10.** The parties' submissions to date reveal that many of the coinsurers were European concerns. The list also includes another New York firm, a Texas firm, and two New Jersey firms.

**11.** New York law recognizes that a fiduciary duty may arise in an agency relationship. *See In re Shulman Transport Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir.1984). However, a finding that the elements of agency are present undermines the prosecution's arguments regarding the existence of a fiduciary duty. An agency arises whenever (i) the principal manifests an intent that the agent shall act on his behalf, (ii) the agent accepts the undertaking, and (iii) the parties understand that the principal still controls the undertaking. *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F.Supp. 1522, 1546 (S.D.N.Y.1991). Because "there can be no agency relationship where the alleged principal has no right of control over the alleged agent," *Mazart v. State*, 109 Misc.2d 1092, 441 N.Y.S.2d 600, 605 (N.Y.Ct.Cl.1981), the government's theory that a fiduciary relationship is present because USAU retained sole discretion over the management of claims and litigation is substantially undercut by a finding that the principals retained discretion.

tionship does or does not exist), *rev'd on other grounds*, 773 F.2d 477 (2d Cir.1985); *Banco De Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F.Supp. 1302, 1037 n. 6 (S.D.N.Y. 1989); *see also Scott v. Dime Savings Bank*, 886 F.Supp. 1073 (S.D.N.Y.1995), it is entirely appropriate for a court to examine defendants' contention that in this case as a matter of law none of the above-mentioned fiduciary relationships exists.[12]

*USAU's Insureds*

■ The fiduciary relationship that an insurer owes to its insured is a fixture of New York law. *Zurich Insurance Co. v. State Farm Mutual Auto Insurance Co.*, 137 A.D.2d 401, 524 N.Y.S.2d 202, 203 (1st Dept. 1988); *Hartford Accident and Indemnity Co. v. Michigan Mutual Ins. Co.*, 93 A.D.2d 337, 462 N.Y.S.2d 175, 177 (1st Dept.1983), *aff'd*, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984). Relying primarily on *Hartford Accident*, federal courts have consistently interpreted New York case law to impose such a duty. *Hartford Accident & Indemnity Co. v. Commercial Union Insurance*, 772 F.Supp. 741, 744 (E.D.N.Y.1991), *aff'd*, 962 F.2d 1 (2d Cir.1992); *Harris Trust & Savings Bank v. John Hancock Mutual Life Insurance Co.*, 767 F.Supp. 1269, 1283 (S.D.N.Y.1991), *aff'd in part, rev'd in part*, 970 F.2d 1138 (2d Cir.1992), *cert. denied*, 507 U.S. 986, 113 S.Ct. 1585, 123 L.Ed.2d 151 (1993).

Notwithstanding this array of precedent, defendants argue that two factors remove this case from the norm. First, they rely on Second Circuit authority that no fiduciary duty exists between an insurer and its reinsurer when they are both sophisticated commercial entities. *Christiania General Insurance Corp. v. Great American Insurance Co.*, 979 F.2d 268, 280–81 (2d Cir.1992). *Christiania* is factually distinguishable because it involved the relationship between an insurer and its reinsurer, not the insurer/insured relationship alleged between USAir and USAU. Even were it appropriate to apply

the "sophisticated commercial entity" analysis to the insurer/insured relationship, such a conclusion would not require a finding of the absence of a fiduciary relationship as a matter of law. The particular sophisticated commercial entities involved in this case were in different businesses. USAir and Ogden–Allied may have been knowledgeable about their own businesses, aviation, and security, respectively, but not necessarily insurance. Though they may have possessed some degree of generic business sophistication, it would be nonetheless reasonable for a jury to infer that both relied extensively on the superior expertise of USAU.

While this Court is not prepared to find that the absence of a fiduciary relationship between USAir and USAU as a matter of law, neither does it accept the government's invitation to find as a matter of law that such a duty did exist. Instead, the existence of a fiduciary relationship in this context presents a jury question.[13]

*USAU's Concurrent Insurers*

■ In the context of the relationship between USAU and its coinsurers, defendants again argue that as a matter of law there can be no fiduciary relationship between such sophisticated commercial entities, both presumably experts in the field of insurance, negotiating arms-length contracts. Instead, they argue that the highest duty that may be imposed on them is the general duty of good faith and fair dealing that inheres in New York contracts generally. *Travellers Int'l A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir.1994). Defendants note that under Illinois law mere reliance on information from another party to a contract is insufficient to create a fiduciary duty (citing *International Insurance Co. v. Certain Underwriters at Lloyd's of London*, 1991 WL 349907 (N.D.Ill.1991)), and argue that cases holding that a primary insurer owes its excess insurer a fiduciary duty, such as *Zurich Insurance Co. v. State Farm Mutual Auto Insurance Co.*, 137 A.D.2d 401, 524 N.Y.S.2d

**12.** Defendants' insistence that this proposition is pleaded in the indictment as a matter of law and, therefore, must be decided by the Court is so much tautological sophistry.

**13.** The government refers to a significant amount of grand jury testimony in which USAU employees and executives characterize all four of these relationships as fiduciary. Such lay conclusions stand on no firmer footing than a juror's; perhaps, less firm.

202, 203 (1st Dept.1988); *Hartford Accident and Indemnity Co. v. Michigan Mutual Insurance Co.*, 93 A.D.2d 337, 462 N.Y.S.2d 175, 177 (1st Dept.1983), *aff'd*, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984); and *Highlands Insurance Co. v. National Union Fire Insurance Co. of Pittsburgh*, 27 F.3d 1027, 1030 n. 10 (5th Cir.1984) (applying New York law), are factually inapposite because the relationship between a primary insurer and its excess insurer is different from the relationship among coinsurers.

Coinsurance differs from excess insurance in important ways. In the traditional coinsurance agreement, the risk is distributed among several companies, each of which bears a portion of the risk and obligates itself directly to the original insured. 13A John A. Appleman & Jean Appleman, Insurance Law and Practice § 7681 [hereinafter "Appleman's"]. When the insurers instead obligate themselves to the insurer that was first approached by the insured, the arrangement is referred to as "internal coinsurance." *Id.* Because the structure spreads the risk horizontally among insurers, this arrangement has been characterized as being "upon the very fringe of true reinsurance." *Id.* Excess insurance is a reinsurance contract pursuant to which a primary insurer vertically cedes all of its risk over an obligation to pay a sum certain. *Id.*

The issue as to who is a fiduciary cannot be resolved solely on the basis of the names used by the industry in describing the relationship. "New York courts typically focus on [the factual question] whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." *Scott*, 886 F.Supp. at 1078 (quoting *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 767 F.Supp. 1220, 1231 (S.D.N.Y.1991), *rev'd on other grounds*, 967 F.2d 742 (2d Cir.1992)). The

actual terms of the coinsurance con among these parties provide much better guidance than the name placed on the relationship. The contract at issue here provided that USAU would act as lead insurer, that it would retain sole discretion and exclusive control over any investigation or subsequent lawsuit including settlements and negotiations (contract at ¶ 3), and that all parties agreed that USAU would bind all parties (contract at ¶ 6). The nature of the relationship was such that a jury could reasonably conclude that the coinsurers had no choice but to place trust in USAU's integrity and good faith. In the face of the contract's language, the issue cannot be resolved as a matter of law.

### USAU's Own Reinsurers and Retrocessionaires

The question whether USAU owed a fiduciary duty to its own reinsurers involves a different set of relationships. Defendants again argue that *Christiania* controls the disposition of this issue.[14] In *Christiania*, a third level reinsurer of American Honda's risk on products liability claims ("Great American") ceded a portion of its risk to plaintiff reinsurance companies. The reinsurers sought a declaratory judgment that they were not liable to provide Great American with coverage because Great American had breached a fiduciary duty by failing to provide prompt notice of claims and misrepresenting facts relating to those claims. The court declined to adopt "[the plaintiff's] characterization of the relationship between a reinsured and reinsurer as inevitably fiduciary." *Christiania*, 979 F.2d at 280.

There is no reason to quarrel with a holding that declines to impose a fiduciary duty as a matter of law upon the relationship of reinsured and reinsurer without regard for the particular circumstances of the case.

**14.** Defendants also point to two Seventh Circuit cases interpreting Illinois law to hold that a reinsured does not owe a fiduciary duty to its reinsurers. *See, e.g., International Insurance Co. v. Certain Underwriters at Lloyd's London*, 1991 WL 349907 (N.D.Ill.1991); *International Surplus Lines Insurance Co. v. Fireman's Fund Insurance Co.*, 1989 WL 165045 (N.D.Ill.1989). The holdings in those cases appear to have flowed from the courts' stated reluctance to interfere with

Illinois' established policy against imposing a fiduciary duty in the insurer-insured relationship. Since Illinois did not impose such a duty in that context, the courts reasoned that it would not in the reinsurer-reinsured context. New York, on the other hand, allows imposition of a fiduciary duty between the insurer and insured. Accordingly, the principal policy concern that these cases addressed is not present here.

Several important circumstances distinguish this case from *Christiania*. The decisive distinction is the nature of the insurance contract between the parties in each case. The reinsurance industry comprises two separate classes of insurance, facultative and treaty. In facultative reinsurance contracts, an insurer cedes to the reinsurer part or all of a risk under one or more insurance policies specifically identified in the insurance contract. 13A Appleman's at § 7681 (Supp. 1 1994). In such a contract, the reinsurer generally retains the right and opportunity to participate and intervene in the handling of claims or suits. *Unigard Security Insurance Co. v. North River Insurance Co.*, 4 F.3d 1049, 1054 (2d Cir.1993).

Treaty reinsurance contracts oblige the reinsurer to accept in advance a portion of all types of risks that the insurer underwrites or on risks to a particular class of insureds or risks. 13A Appleman's at § 7681. Under a treaty insurance arrangement, the reinsurer has no right to participate in the management of the underlying litigation but instead must "place an extraordinary amount of confidence in the reinsured's evaluation of policy risks and in the information it receive[s] from the reinsured regarding the individual policies in the group." *International Surplus Lines Insurance Co. v. Fireman's Fund Insurance Co.*, 1989 WL 165045 at *5 (N.D.Ill. 1989).

Defendants cite exclusively cases interpreting the duties owed in a facultative relationship. Because the insurance in this case was treaty insurance, USAU's reinsurers necessarily reposed more reliance on USAU to manage the underlying litigation than in the situation by cases involving facultative reinsurance. Where a treaty insurance contract provides that the reinsured administers the ceded policies and retains dominance over reporting and administration, several courts applying the law of other states have found a fiduciary relationship. *See, e.g., Mutuelle Generale Francaise Vie v. Life Assurance Company of Pennsylvania*, 688 F.Supp. 386, 398 (N.D.Ill.1988); *Fortress Re, Inc. v. Jefferson Insurance Company of New York*, 465 F.Supp. 333, 339 (E.D.N.C.1978), *aff'd*, 628 F.2d 860 (4th Cir.1980); *cf. Inter-*

*national Insurance Co. v. Certain Underwriters at Lloyd's London*, 1991 WL 349907 at *8 (N.D.Ill.), *reconsidered in part*, 1991 WL 639438.

Even more important is the difference between the roles said to have been played by the defendant in *Christiania* and by USAU in the underlying litigation. Unlike American General in *Christiania*, USAU is said to have been more than a reinsured; it acted as lead insurer and managed the entire litigation. American General was three levels removed from the original insurer. USAU was an original insurer. The dispute in *Christiania* only implicated American General's direct relationship with its reinsurer. This case deals with USAU's management of the underlying litigation and apportionment of liability among all parties to the contracts of insurance.

Because cases decided under New York law interpret only the duties owed in remote or facultative relationships and because cases interpreting treaty relationships rely on the law of other states, it is appropriate to refer again to the general principles underlying fiduciary relationships in New York. The allegations of this case easily meet New York's requirement that one party reposed trust or confidence in another. USAU's reinsurers had no choice but to assume the risk and allow USAU to look after their interests in any resulting claims or litigation.

Defendants' argument that these were sophisticated commercial entities operating at arms length has more force when sorting out the duties owed between two insurance companies than it does in the context of the typical relationship between insurer and insured. Nevertheless, the argument assumes that the parties begin and remain as equals. The benefits of sophistication and relative equality that these parties enjoyed precontract was nullified once USAU assumed the dominant position in the relationship by contract. *Cf. North River Insurance Co. v. Philadelphia Reinsurance Corp.*, 797 F.Supp. 363, 370 (D.N.J.1972).

Because the question of a fiduciary relationship between these parties is a factual and not a legal issue, it would be premature

to hold on this record that no fiduciary relationship was possible.

*The Concurrent Insurers' Reinsurers and Retrocessionaires*

 The most attenuated relationship presented by the papers is that between USAU and its concurrent insurers' reinsurers and retrocessionaires (the "secondary reinsurers"). Defendants premise their argument that USAU did not owe a fiduciary duty to the secondary reinsurers on their argument that USAU did not owe a duty to its own reinsurers (the "primary reinsurers"). As already noted, defendants' argument on this point does not withstand scrutiny and therefore does not assist in determining whether USAU owed such a duty to the secondary insurers. Defendants also argue, however, that the lack of contractual privity between these parties precludes recognition of a fiduciary relationship between them.[15]

Accepting defendants' argument would require this Court to impose a privity requirement as yet unarticulated by the New York judiciary. The only basis defendants offer for such a conclusion is a case interpreting Connecticut law, holding that no duty runs from a reinsurer directly to the policyholder. *Travelers Indemnity Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 76 (2d Cir.1995); *Unigard*, 4 F.3d at 1054.

Of course, establishing a relationship of trust and confidence requires some communication, direct or indirect, between the parties. However, to impose a requirement that a relationship be memorialized in a writing among every party to a joint relationship such as this would not vindicate New York's policy of providing for fiduciary accountability where a relationship of trust or confidence is used by one party to the detriment of others. There is a sufficient nexus in the allegations here between the parties for a jury to infer a fiduciary relationship.

Accordingly, the request to dismiss the indictment for lack of a fiduciary relationship is at this stage denied.

## Pre-emption Under McCarran–Ferguson

Defendants previously moved for dismissal of the indictment on the ground that the McCarran–Ferguson Act precludes application of any federal law that "invalidate[s], impair[s], or supersede[s] state law." 15 U.S.C. § 1012. Although this Court denied the motion on November 1, 1995, defendants now renew it. They argue that, because no fiduciary duty exists under New York law in any of the relationships between USAU and its various concurrent insurers and reinsurers, application of the mail fraud statute and concomitant imposition of such a duty would directly conflict with and therefore invalidate, impair, and supersede New York law. Since this Court rejects the underlying premise that no fiduciary duty exists under New York law, the motion is denied.

## The Statute of Limitations

 Defendants next argue that the statute of limitations bars their prosecution on the first seven counts of the indictment. An indictment tolls the statute of limitations as to the charges contained in that indictment. *United States v. Grady*, 544 F.2d 598, 601 (2d Cir.1976). "A superseding indictment brought at any time while the first indictment is still validly pending, if and only if it does not broaden the charges made in the first indictment, cannot be barred by the statute of limitations." *Id.* at 602 (citations and footnotes omitted). Under *Grady*, if the superseding indictment "broaden[ed] or substantially amend[ed]" the charges made in the first indictment, the first seven counts would be barred because they occurred before June 5, 1990.[16]

---

15. Here, of course, defendants cannot rely on their arms-length negotiation analysis, presumably because these entities never negotiated directly. Assuming that the existence of a fiduciary duty rises or falls on arms-length dealings, as defendants maintain, defendants' logic here argues in favor of finding a fiduciary duty.

16. The statute of limitations for mail fraud is five years. 18 U.S.C. § 3282. The superseding indictment was returned on October 18, 1995. Under an agreement between the defendants and the government, the statute of limitations was tolled for an additional 135 days. Therefore, the relevant date for purposes of this discussion is June 5, 1990.

The defendants point to the government's inclusion of a deprivation of honest services "theory" under 18 U.S.C. § 1346 as a "substantial broadening."[17] This argument overlooks a number of cases that have considered and rejected such a claim. *United States v. Italiano,* 894 F.2d 1280, 1284–86 (11th Cir.), *cert. denied,* 498 U.S. 896, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990); *United States v. Davis,* 714 F.Supp. 853, 864 (S.D.Ohio 1988); *United States v. Lytle,* 677 F.Supp. 1370, 1376–78 (N.D.Ill.1988). The defendants' attempt to distinguish these cases on the basis that they do violence to the principles set out in *Grady* and similar decisions borders on frivolous. Each of these decisions explicitly mentions *Grady* or a case setting out the same principles as controlling the analysis. *See Italiano,* 894 F.2d at 1282 ("superseding indictment is valid so long as the original indictment does not broaden or substantially amend the original charges"); *United States v. Lytle,* 677 F.Supp. at 1376 ("earlier indictment tolls the statute of limitations if the superseding indictment does not broaden or substantially amend the original charges").

The defendants' contentions ring especially hollow when considered in light of the concerns underlying *Grady.* The primary reason that an indictment tolls the statute of limitations is that "[t]he defendants are put on timely notice ... that they will be called to account for their activities and should prepare a defense." *Grady,* 544 F.2d at 601; *see also United States v. Gengo,* 808 F.2d 1, 3 (2d Cir.1986) ("notice is the touchstone in deciding whether a superseding indictment substantially changes the original charges"). The superseding indictment, other than correcting typographical errors on two mailings, did not allege any new material facts. Moreover, the addition of § 1346 is not an additional theory; it is a definitional section. The original indictment made clear that the

prosecution was founded on the breach of a fiduciary duty, something that was also explicit in the original indictment. At a minimum the defendants would have to show that they were prejudiced by the delay, *United States v. Robilotto,* 828 F.2d 940, 949 (2d Cir.1987), something they have not even alleged, much less established.

The defendants also allege that counts five and seven of the superseding indictment must be dismissed as, what they characterize as, completely new charges. The government notes that neither count is in fact new but that both reflect corrections of typographical errors in the original indictment which do not constitute broadening or altering of the charges in the original indictment.[18] *United States v. Robilotto,* 828 F.2d 940, 949 (2d Cir.1987); *United States v. Gengo,* 808 F.2d 1, 3–4 (2d Cir.1986) (change in starting date of conspiracy is technical amendment), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988); *United States v. Wright,* 1990 WL 78035 (N.D.Ill. 1990) (correction of mailing date in mail fraud prosecution).

Although language in *Grady* suggests that amendments that "differ[ ] both in respect to dates and specific names ... might constitute an improper amendment," *Grady,* 544 F.2d at 603, that is not the case here. Only the dates were changed. *See also United States v. Castellano,* 610 F.Supp. 1359, 1381 (S.D.N.Y.1985) (addition of defendants coupled with change in dates). Bearing in mind that "notice is the touchstone," it is clear that the original indictment clearly informed defendants that they would be asked to account for their allegedly fraudulent conduct in allocating liability for the PSA crash. The defendants have not alleged or shown any prejudice arising from the superseding in-

---

17. The defendants refer to language in a government letter and prosecutors' statements at argument on November 1, 1995, to establish that the government viewed the superseding indictment as a broadening of the charges within the meaning of the statute of limitations. There is no reason to suppose that the government in using that language intended to concede that the prosecution was barred.

18. Count five in the superseding indictment (a March *30,* 1990 mailing) replaces count four in the original indictment (which mistakenly alleged a March *3,* 1990 mailing date). Count seven in the superseding indictment (a May 2, *1990* mailing date) was count 34 in the original indictment (which mistakenly alleged a May 3, 1992 mailing date).

dictment, nor is any such effect readily apparent. *Robilotto,* 828 F.2d at 949.

■ Defendants' last contention is that the mail fraud counts in the superseding indictment should be dismissed because the intangible rights theory "straddles a material change in the law." The defendants acknowledge that the Second Circuit has held that mail fraud prosecutions brought under this section are valid if, as here, the mailings occurred after the enactment of § 1346. Defendants say they mention this point to "preserve" it but leave this Court to guess at the nature of their point. One guess is that the defendants would like to test the theory that a prosecution of a scheme conceived before the statute was enacted, but consummated after, is immune from prosecution. But that is a guess. The Court at this point simply notes that no issue is properly before it until the defendants present a theory which provides a basis for the government to oppose it and this Court to decide it. *United States v. Lampkins,* 47 F.3d 175, 177 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1440, 131 L.Ed.2d 319 (1995). Presenting an issue in such a fashion as here done does not "preserve" an issue; if anything, it waives it.

Accordingly, the motion to dismiss on statute of limitations grounds is denied.

**Sufficiency of the Mail Fraud Allegations**

■ Defendants' next claim is that the indictment must be dismissed because it fails to allege conduct on which a mail fraud prosecution may be maintained. To test whether an indictment is legally sufficient, a court must examine whether it "first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Covino,* 837 F.2d 65, 69 (2d Cir.1988) (internal citations omitted). "An indictment need only track the language of the statute and, if necessary to apprise the defendant 'of the nature of the accusation against him,' . . . state time and place in approximate terms." *Id.* The parties agree that the mail fraud statute requires the government to allege (i) a scheme to defraud, (ii) a deprivation of money or

property, and (iii) the use of the mails to further the scheme, *United States v. Mittelstaedt,* 31 F.3d 1208, 1216 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 738, 130 L.Ed.2d 640 (1995).

*Money or Property Allegations*

■ Defendants first attack the sufficiency of the allegations regarding money or property. "[T]he original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *McNally v. United States,* 483 U.S. 350, 356, 107 S.Ct. 2875, 2880, 97 L.Ed.2d 292 (1987). The property may be tangible or intangible, but the statute does not encompass a scheme the object of which was solely to secure a benefit to the perpetrator or involved a "unilateral expectation." *See, e.g., McNally v. United States,* 483 U.S. 350, 356, 107 S.Ct. 2875, 2879–80, 97 L.Ed.2d 292 (1987) (benefit to perpetrator without deprivation of property of victim insufficient); *Carpenter v. United States,* 484 U.S. 19, 25, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987) (intangible property right in confidential information sufficient to satisfy mail fraud statute); *Roitman v. New York City Transit Authority,* 704 F.Supp. 346, 349 (E.D.N.Y. 1989) (no cognizable property right in ability to make career change to teaching). To ensure that mail fraud prosecutions do not go forward on the basis of a simple appropriation of benefits to the schemer or deprivation of amorphous property rights from a victim, the government but must show that "the defendants contemplated some actual harm or injury." *United States v. Starr,* 816 F.2d 94, 98 (2d Cir.1987).

In the indictment, superseding indictment, and at least three letters to the defendants, the government has stated that the defendants' scheme had the following objects: (i) to secure future renewals of USAir and Ogden–Allied's policies, (ii) to eliminate expenditures that would have been required of USAIG if Ogden–Allied were found at all liable for the accident, (iii) to cause the companies who insured USAir to pay Ogden–Allied's fair share of these claims, (iv) to deprive both USAir and its various insurers

of their opportunity to "negotiate a better deal."[19]

 Defendants, taking a divide-and-conquer approach, assail the first two objects, the policy renewals and savings to USAIG, as benefits to USAU, not money or property taken from the victims. They also assert that the benefits to accrue to USAU are too tentative and speculative to support the indictment. These arguments betray a misunderstanding of the requirements of a mail fraud prosecution in this Circuit. A scheme may have multiple objectives at least one of which must be the deprivation of money or property from the victims. *See, e.g., United States v. Eisen,* 1990 WL 164681, (E.D.N.Y. 1990), *aff'd,* 974 F.2d 246 (2d Cir.1992), *cert. denied,* 507 U.S. 998, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993). The government has alleged that one of the objects of the scheme was the expenditure incurred by USAir's insurers in paying claims wrongfully laid at their door. This allegation is sufficient to support the indictment.

 Nevertheless, defendants maintain that the indictment must still be dismissed because the "linkage" between the deprivations (costs incurred by the USAir's insurers and loss of a chance to settle) and the various benefits that accrued to USAIG (savings on claims paid by USAir insurers and renewals of policies) is too attenuated to permit the prosecution to go forward.[20] They rely on the Seventh Circuit's holding in *United States v. Walters,* 997 F.2d 1219 (7th Cir. 1993). *Walters* reversed the mail fraud conviction of a sports agent who circumvented NCAA rules by surreptitiously signing players as clients while they were still playing college ball. The contracts invalidated the players NCAA eligibility. Because the colleges were unaware that their players were ineligible to play, they unwittingly continued to pay scholarships. The government prosecuted Walters under § 1341 on the theory that the victimized colleges spent money they otherwise would have saved had they known the truth. The court held that this was not money or property within the meaning of § 1341 because the colleges were not out of pocket to Walters and because the losses were incidental to the scheme. Defendants read *Walters* to hold that, unless the victim takes his money directly from the defendant, a mail fraud prosecution is not viable. *Walters,* 997 F.2d at 1224–27.

To resolve this issue, this Court turns from the Seventh Circuit to the Second. In *United States v. Starr,* 816 F.2d 94 (2d Cir.1987), the Court of Appeals had to decide whether a bulk mailing fraud that deprived the post office of revenue could support a mail fraud prosecution. The court held that there was deprivation of money or property within the meaning of the statute only where a schemer appropriates a benefit and there is "a corresponding loss or injury to the victim of the fraud." *Starr,* 816 F.2d at 101. The court held that the harm that "must affect the very nature of the bargain itself." *Starr,* 816 F.2d at 98.

**19.** Defendants submit that USAir could not have been a victim of the fraud because it "received exactly what it paid for—full insurance coverage for its liability in the PSA litigation." The Second Circuit, however, has found that "providing alternate services does not defeat a fraud charge because the fact remains that the corporation and its shareholders did not receive the services that they believed were being provided." *United States v. Wallach,* 935 F.2d 445, 460 (2d Cir. 1991). Even though USAir received "a quid pro quo of equal value, ... [it] has lost [its] chance to bargain with the facts before [it]." *In re Seizure of All Funds in Accounts in the Names Registry Publishing, Inc.,* 68 F.3d 577, 581 (2d Cir.1995). Although defendants still feel that this object is too amorphous, they provide no legal basis for this Court to hold that it does not come within *Wallach.* Furthermore, although the parties do not discuss the point, the indictment specifically alleges that "among USAir's concerns was that the greater percentage of liability attributed to it, the more likely that its loss experience rating would be adversely affected, possibly causing increased insurance premiums in the future." Indictment at ¶ 12.

**20.** Defendants also seek dismissal because the indictment does not identify the victims or quantify the responsibility that should have been apportioned to Ogden–Allied. The Court has already denied the defendants' motion for a bill of particulars on the identity of all the parties allegedly defrauded as well as the amount of money involved. The defendants provide no legal authority to support their argument that the absence of these particulars renders the indictment defective.

In this case, defendants' alleged benefits corresponded directly to the contemplated loss. As the payout by USAU and USAIG decreased, its victims' payout increased. The nature of the bargain between USAU and the coinsurers, reinsurers, and retrocessionaires was that USAU would manage the PSA claim to the mutual advantage of all in return for a fee. Instead, USAU is alleged to have managed the PSA claims to its own and USAIG's benefit at the expense of those covering USAir's risks. With respect to the insured USAir, the bargain between the insurer and the insured was the provision of insurance to cover losses in return for premiums; fraud which contemplated inflating USAir's loss would certainly go the heart of USAU's relationship with its insured.

The fact that the insurance monies paid out by the scheme's victims went to those injured in the PSA crash rather than directly to USAU is of as little significance as would be the fact that a card sharp asked his victim to give money won by his bottom-of-the-deck deal to the player to whom the shark had lost the previous hand. The indictment alleges that USAU did not perform its obligations and that the victim insurers were injured as a result. *See United States v. Eisen*, 974 F.2d 246, 252. The indictment adequately alleges the necessary correspondence between the fraud and the loss incurred and will not be dismissed on this ground.

■■■ Defendants also contend that, even if there is a correspondence between the financial benefits obtained by USAU and the money or property lost by the victims, a part of the indictment nevertheless fails under the "convergence" theory. Under the convergence theory, the parties to whom the misrepresentations were made must be identical to the alleged victims. In this case, the indictment alleges that USAU misrepresented material facts to USAir and to the concurrent insurers; it does not allege that USAU had any contact with the reinsurers and retrocessionaires.

There is some question whether the convergence theory is viable in the Second Circuit. *Eisen*, 974 F.2d at 253 & n. 2 (citing cases). Even if the convergence theory were applicable, the defendants could not invoke it

simply by taking an overly narrow view of the victims in this case and ignoring the likelihood that misrepresentations were repeated and carried on to reinsurers and retrocessionaires. In all events, the theory is satisfied where, as here, the defendants make fraudulent misrepresentations directly to at least some of the injured parties and intend that those parties rely on them to their detriment and to the benefit of the liars. *See, e.g., Eisen*, 1990 WL 164681 at *2 (civil litigants made misrepresentations to jury causing litigants to pay damage awards to schemers).

*Mailings in Furtherance of the Scheme*

■■■ Defendants next ask for dismissal of the indictment on the grounds that the mailings were not in furtherance of the scheme to defraud. The mail fraud statute contemplates prosecution only where "the use of the mails is a part of the execution of the fraud." *Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). Letters that are " 'incident to an essential part of the scheme,' ... or 'a step in the plot,' " satisfy the in furtherance of requirement. Ordinarily, mailings may not occur after the fraudulent scheme has reached fruition. *United States v. Maze*, 414 U.S. 395, 400–02, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). Whether mailings were in fact in furtherance of a scheme is a question for the jury under all but the most extraordinary circumstances. *United States v. Castor*, 558 F.2d 379, 384 (7th Cir.1977), *cert. denied*, 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978) (jury question "unless it so convincingly appears on the face of the indictment that as a matter of law there need be no necessity for such delay.").

Defendants read the indictment to allege a "one-shot deal" with the single objective of misallocating liability for the PSA crash. According to the indictment, as defendants read it, this objective was achieved between June and September of 1989. Since the earliest mailing is dated January 8, 1990, the defendants contend that all of the mailings came after the scheme reached fruition and could not have been part or in furtherance of its execution. However, a determination as to when a scheme has reached fruition may

turn on whether its success depends on "the [defendant's] continued harmonious relations with, and good reputation among, [the victims]." *Schmuck v. United States,* 489 U.S. 705, 711–12, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989). In such a case, "delayed mailings" or "lulling letters" satisfy the in furtherance element. *United States v. Angelilli,* 660 F.2d 23, 37 (2d Cir.1981). This is true even though the mailings follow the actual transfer of the financial benefits sought to be obtained. *Wallach,* 935 F.2d at 465.

The allegations suggest that there will be evidence from which a jury could find that this was an ongoing scheme. USAU's survival as a business depended on its continued harmonious relationships with its insureds, coinsurers, reinsurers, and retrocessionaires. USAU's alleged short-term goal of minimizing its losses in this particular litigation could arguably at least be best realized by convincing the remaining parties that it had done nothing wrong. Disruption in the facade would, according to the prosecution, have been fatal to USAU's relationships with USAir and Ogden–Allied and destroy its reputation in the industry. It would have lost future premiums and ended its career as a lead insurer.

■ Defendants argue that the mailings were so remote from the alleged fraud that they could not possibly have been part of its execution.[21] *Altman,* 48 F.3d at 103 (confirmatory or accounting documents do not satisfy in furtherance requirement). However, such fact-based arguments as to whether a particular mailing had a sufficient connection to the fraud cannot be resolved in advance of trial. *See United States v. Turoff,* 701 F.Supp. 981, 991 (E.D.N.Y.1988) ("it will be for the jury to determine whether those mailings were for the purpose of executing the scheme to defraud or were entirely incidental to it").

Accordingly, the motion to dismiss the indictment for failure to allege conduct on which a mail fraud prosecution may be maintained is denied.

### Attorney/Client Privilege

■ Defendants argue finally that the interviews of Alpert and Zoffer breached the attorney/client and attorney work-product privileges and that, because the indictment is the fruit of those breaches, it must be dismissed. In the alternative, they ask this Court to hold an evidentiary hearing on the scope of the breaches and determine the appropriate remedy.

■ The attorney/client privilege rests on the assumption that encouraging clients to be frank with their attorneys assists in the preparation of a defense and aids the truth-seeking process. *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). Because the privilege "has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *Fisher,* 425 U.S. at 403, 96 S.Ct. at 1577. The party seeking to invoke the privilege has the burden of establishing its elements. *von Bulow v. von Bulow,* 811 F.2d 136, 146 (2d Cir.), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987).

■ The privilege attaches

(1) Where legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or the legal adviser, (8) except the protection be waived.

---

**21.** Defendants identify nine categories of mailings in the indictment: (i) correspondence between USAU and Associated Aviation Underwriters (AAU) regarding a bill from a private investigator, (ii) a letter from AAU to USAU asking for a response to a prior letter, (iii) monthly statements from USAU to Aviation Adjustment Bureau (AAS), (iv) mailings pertaining to AAU's separate lawsuit against Los Angeles International Airport, (v) letters accompanying payments from AAS to USAU, (vi) letter accompanying refund from USAU to AAS, (vii) letter from USAU to AAS discussing indemnification, (viii) letters discussing the status of the PSA litigation with interested parties, and (ix) invoices from USAir's attorneys in the PSA litigation.

*United States v. Kovel,* 296 F.2d 918, 921 (2d Cir.1961). Because privilege is fact-based, defendants must make this showing as to each communication with respect to which they assert the privilege. *Allendale Mutual Insurance v. Bull Data Systems, Inc.,* 145 F.R.D. 84, 86 (N.D.Ill.1992).

 The attorney/client privilege may extend to confidential communications with an in-house counsel at a corporation. *Upjohn v. United States,* 449 U.S. 383, 394, 101 S.Ct. 677, 684–85, 66 L.Ed.2d 584 (1981). The party claiming the privilege must show that it sought legal, not business, advice. *See, e.g., U.S. Postal Service v. Phelps Dodge Refining Corp.,* 852 F.Supp. 156 (E.D.N.Y. 1994); *see also In re Grand Jury Subpoena,* 599 F.2d 504, 511 (2d Cir.1979).

 The defendants also invoke the attorney work-product rule. Although initially developed in civil actions, work-product protection may be asserted in criminal proceedings. *United States v. Hoyvald,* 1987 WL 30638 at *2 (E.D.N.Y.1987). Where a party establishes that materials in its possession were prepared in anticipation of litigation, they may be discovered only if the party seeking discovery shows a substantial need for them in order to prepare his own case and virtual unavailability of them without extreme hardship. *In re Grand Jury Proceedings,* 73 F.R.D. 647, 653 (M.D.Fla.1977). The purpose of the rule is "to encourage effective legal representation by removing counsel's fear that his thoughts and information will be invaded by his adversary if he records them." *Republic Gear Co. v. Borg-Warner Corp.,* 381 F.2d 551, 557 (2d Cir. 1967).

Where, as here, the litigation for which these materials were prepared is long over, there is divergent authority whether the privilege continues to apply. *See Hoyvald,* 1987 WL 30638 at *2 ("the primary purpose for which work-product protection was developed has already been served"); *In re Grand Jury Proceedings,* 73 F.R.D. at 653 ("where the work-product materials were prepared for a distinct and prior criminal litigation, long completed, the policies underlying the work-product privilege have already been achieved"); *United States v. IBM,* 66 F.R.D.

154, 178 (S.D.N.Y.1974) ("attorneys' memorandum in a prior case involving different parties does not have the protection of the 'work-product' principle").

The Court turns first to the issues raised by the attorney/client privilege. The defendants argue that, notwithstanding any waivers by USAir or Ogden–Allied, the communications between representatives and those entities and Alpert are privileged under the "joint defense" exception. Where there are multiple parties in a lawsuit, each party may claim the privilege with respect to communications between parties and their respective attorneys. *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989). The analogy of an attorney coordinating multiple interests is superficially consistent with the relationship between an insurer and an insured with respect to litigation arising out of the coverage. *Continental Casualty v. Pullman, Comley, etc.,* 929 F.2d 103, 108 (2d Cir.1991) ("the relationship between the insured and the insurer's legal department is that of attorney and client").

The government argues that the analogy breaks down because USAU's interests were anything but consistent with those of USAir and Ogden–Allied. Where the interests of the insurer and insured are adverse or in conflict, no joint defense privilege arises. When the parties interests diverge during the course of the same or subsequent litigation, the privilege dissolves. *North River Insurance v. Columbia Casualty Co.,* 1995 WL 5792 at *2, *5 (S.D.N.Y.1995). *Buck v. Aetna Life & Casualty Co.,* 1992 WL 130024 at *2 (E.D.Pa.1992).

 The assumption on which the government's argument rests, that the interests of Ogden–Allied, USAir, and USAU were adverse, is at the heart of this prosecution and remains to be proven at trial. Fed. R.Crim.Pro. 12(e) provides that for good cause a district judge may defer consideration of a pretrial motion until after trial. *See also United States of America v. Williams,* 644 F.2d 950, 952 (2d Cir.1981). Good cause exists where "it would be impractical and unwise to attempt pretrial resolution of the ... claims because they are substantially founded upon and intertwined with the evidence to be presented at trial." *Id.* at 952–53.

The pertinent questions raised by defendants' motion are: (i) whether the attorney/client privilege applies to these communications; (ii) whether the privilege was waived; (iii) whether an exception, such as the crime fraud exception, exists; (iv) whether the privilege was breached, (iv) whether Judge Platt's order remedied any misconduct; and (v) if not, whether the breach tainted the indictment or requires other remedy.

Defendants, at this stage, have not shown a likelihood of success on these issues. In particular, it appears likely that most communications were business-related within the crime-fraud exception or, if privileged under a joint-defense theory, that the privilege has been waived. Since the contents of the communications have, for better or worse, been now repeatedly disclosed—to the government, to the grand jury, to the Court among others—no irreparable injury has occurred that could not be remedied equally well by a post-trial remedy of dismissal of the charges or other relief.

Accordingly, the motion for dismissal of the indictment on privilege grounds is deferred until after trial.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.